F. Paul JONES, Petitioner,

v.

**DEPARTMENT OF TRANSPORTATION, Respondent.**

No. 01–3276.

United States Court of Appeals,
Federal Circuit.

July 9, 2002.

Sheldon I. Cohen, Sheldon I. Cohen & Associates, of Arlington, VA, argued for petitioner.

Elizabeth G. Candler, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With her on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Bryant G. Snee, Assistant Director.

Before LOURIE, GAJARSA, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

The Department of Transportation ("DOT") removed Mr. Jones from his position as a Criminal Investigator in the DOT's Office of the Assistant Inspector General for Investigations. The removal charge was for physical inability to perform the functions of his position. At the time he was removed, Mr. Jones was permanently unable to perform his position due to a severe physical incapacity, but Mr. Jones had a positive balance of leave voluntarily transferred to him from other Federal employees. Specifically, Mr. Jones received approximately seven years of donated leave. At the time it removed Mr. Jones, the DOT had approved his use of nearly five years of the donated leave, allowing Mr. Jones to retain his employee status from his incapacity in 1995 through 2000. Mr. Jones appealed his removal to the Merit Systems Protection Board ("the Board"), conceding that the elements of the removal charge were met, but arguing that he had an affirmative defense: the agency could not remove him as long as he had a positive transferred leave balance. Notwithstanding this alleged defense, the Board upheld the DOT's action. *Jones v. Dep't of Transp.,* No. AT–0752–00–0398–I–

1 (M.S.P.B. Nov.28, 2000) (opinion of Administrative Judge ("AJ")) (*"Initial Decision"*), *recons. denied,* No. AT 0752–00–0398–I–1 (MSPB May 11, 2001) (opinion of full Board denying reconsideration, resulting in the AJ's decision becoming the final Board decision) (*"Final Decision"*). Mr. Jones then appealed the Board's decision to this court, raising on appeal only the issue of whether his affirmative defense prohibits the agency from terminating him. We conclude that the Voluntary Leave Transfer Program ("the Program"), *see* 5 U.S.C. §§ 6331–39, does not prohibit the otherwise-proper removal of an employee, even if an employing agency has approved an employee's participation in the Program and the employee has a positive transferred leave balance. Therefore, the Board did not abuse its discretion or otherwise act contrary to law in upholding the DOT's action of terminating Mr. Jones' employment, and, accordingly, we affirm.

## I. BACKGROUND

Mr. Jones' appeal involves examining first, the legal attributes of the Program, second, the circumstances surrounding Mr. Jones' physical incapacity and his use of the Program, and, third, the Board's decision reviewing the DOT's removal of Mr. Jones.

### A. The Voluntary Leave Transfer Program

Pursuant to the authority Congress granted to the Office of Personnel Management ("OPM") via the Federal Employees Leave Sharing Act of 1988 ("FELSA"), OPM created the Program to serve as a means by which a Federal employee can transfer certain unused portions of his or her accrued annual leave to the leave account of an employee experiencing a medical emergency. 5 U.S.C. §§ 6331–34 (2000).[1]

The statute defines the term "medical emergency" as follows:

> [A] medical condition of an employee or a family member of such employee that is likely to require the prolonged absence of such employee from duty and to result in a substantial loss of income to such employee because of the unavailability of paid leave (disregarding any advanced leave).

*Id.* § 6331(4).

The statute also specifies the conditions under which a medical emergency no longer exists:

> The medical emergency affecting a leave recipient shall . . . be considered to have terminated on the date as of which—
>
> (1) the leave recipient notifies the employing agency of such leave recipient, in writing, that the medical emergency no longer exists;
>
> (2) the employing agency of such leave recipient determines, after written notice and opportunity for the leave recipient (or, if appropriate, another person acting on behalf of the leave recipient) to answer orally or in writing, that the medical emergency no longer exists; or
>
> (3) the leave recipient is separated from service.

*Id.* § 6335(a).

When requesting participation in the Program, an employee includes in the application information the anticipated duration of the medical emergency, "and, if it is

---

**1.** Although the FELSA originally granted OPM the authority to operate the Program for only five years, this limitation was repealed by subsequent Congressional action. Federal Employees Leave Sharing Amendments Act of 1993, Pub.L. No. 103–103, § 2, 107 Stat. 1022 (1993).

a recurring one, the approximate frequency of the medical emergency involved." *Id.* § 6333(a)(1)(B)(ii). A participant in the Program may use donated leave "in the same manner and for the same purposes as if such leave" were accrued by the employee as regular earned annual leave. *Id.* § 6333(b), 6303–04 (specifying accrual authority and rates for earned annual leave); *see also Id.* § 6302(d) (noting that annual leave "may be granted at any time during the year as the head of the agency concerned may prescribe."). Finally, a Program participant may not use donated leave after the medical emergency terminates; if the participant does not use the donated leave, the leave must be restored on a pro-rata basis back to the original donors. *Id.* §§ 6335(b)(1), 6336.

### B. Mr. Jones' incapacity and participation in the Program

Mr. Jones was employed by the DOT as a Criminal Investigator (GS–13) when he suffered an incapacitating, non-work-related brain aneurysm on May 28, 1995, while attending a Memorial Day picnic. This left Mr. Jones permanently unable to perform the physical duties of a Criminal Investigator.

After becoming incapacitated, Mr. Jones applied on October 4, 1995, to receive leave donations from other Federal employees through the Program.[2] Later that year, on November 21, 1995, the DOT's Office of

Inspector General ("OIG") notified Mr. Jones of its approval of his application to receive donations of annual leave through the Program.

Over the next few months the Federal employee community, in particular the Federal law enforcement employee community, responded generously and donated, in aggregate, a substantial amount of leave to Mr. Jones. By a letter dated April 16, 1996, the DOT/OIG notified Mr. Jones that as of March 8, 1996, employees from various Federal departments and agencies had donated 14,144 hours, or about seven years worth of forty-hour work-weeks, to Mr. Jones' transferred leave account through the Program.[3] This generous response from the Federal employee community necessitated additional action by DOT/OIG and Mr. Jones to determine how to proceed.

#### 1. Feedback from the GAO and OPM

Given the aggregate quantity of donated leave, in a letter dated March 15, 1996, the DOT/OIG requested input from the Comptroller General of the General Accounting Office ("GAO"). The DOT/OIG noted that Mr. Jones' spouse had advised the DOT/OIG on February 8, 1996, that Mr. Jones was completely paralyzed on his right side and had only recently spoken his first word in nine months. The DOT/OIG stated that it had approved participation in the leave donation program based on the medical certification provided by Mr. Jones,

---

**2.** Mr. Jones applied for the Program using OPM Form 630, which included box ten where the applicant provides the "Date Medical Emergency Ended (or is Expected to End)." In this box, Mr. Jones typed "Unknown." A three-page undated flyer made a part of the record on appeal describes Mr. Jones, his family, his career record, and his situation after the incapacitation, and appeals to federal employees to "give the gift of a lifetime" by contributing annual leave days to Mr. Jones. The flyer notes that Mr. Jones

"needs 800 annual leave days to allow time for recovery or to qualify for retirement."

**3.** Under the Program the leave recipient can accumulate donated annual leave without regard to the limits imposed on the accrual of annual earned leave. 5 U.S.C. § 6333(c)(1) (2000). The limit on accrued annual earned leave for most Federal employees is thirty days. *Id.* § 6304(a).

which "cited 'significant improvement' and the need to provide the employee with as much opportunity as possible to recover." In addition, the DOT noted that Mr. Jones and his spouse now had an expectation that Mr. Jones would stay on "leave status up to the date of his retirement eligibility and beyond." The DOT/OIG further documented for the GAO that Mr. Jones was currently unable to perform his duties and that permitting Mr. Jones to remain on leave status for several years would create a hardship for the DOT/OIG office where Mr. Jones had worked. The DOT/OIG sought input from the GAO as to whether the Program allowed or prohibited long-term leave status supported by donated leave, whether any limits on donated leave existed, and what actions DOT/OIG could take under the statutory and regulatory provisions defining a "medical emergency."

The GAO rendered an opinion to DOT/OIG, dated July 26, 1996, but, recognizing that OPM had primary statutory and regulatory authority for the Program, also forwarded a copy of the DOT/OIG's request to the OPM. The OPM responded separately to the DOT/OIG request for guidance. Both the GAO and the OPM agreed that: (i) the statute and implementing regulations did not limit the amount of leave that may be donated to an employee; but that (ii) employing agencies have discretion to approve or disapprove both an employee's participation in the program *and* have discretion "to approve or deny [an employee's] requests to use donated leave after the employee has been approved as a leave recipient."

### 2. DOT/OIG's decision to keep Mr. Jones in the Program until he qualified for full retirement

From January through May 1997, DOT/OIG requested an additional medical evaluation of Mr. Jones and preliminarily determined to terminate Mr. Jones' participation in the Program effective June 7, 1997. DOT/OIG suggested to Mr. Jones that he apply for disability retirement after his participation in the Program terminated. However, in June 1997, DOT/OIG reconsidered its approach to the situation and committed to keep Mr. Jones in the Program for several more years.[4]

By letter dated June 5, 1997, the DOT/OIG "assure[d]" Mr. Jones that he would "remain in his leave status until and unless the [GAO] Comptroller General advises [that] we have no discretion to continue him in the ... Program." There is no indication that the GAO Comptroller General ever so advised DOT/OIG. However, the DOT/OIG qualified its position as it only committed to keep Mr. Jones in the Program "so long as his 'medical emergency' continues or until he is first eligible for full law enforcement retirement benefits which [DOT/OIG] understand[s] to be October 31, 1999."

### 3. DOT/OIG's removal of Mr. Jones

By letter to Mr. Jones dated November 30, 1999, the DOT/OIG proposed to remove Mr. Jones from his position due to his physical inability to perform his job. Enclosed with the letter were separate applications for a disability retirement and

4. The DOT could only suggest to Mr. Jones that he apply for disability retirement; it could not mandate that Mr. Jones do so because he was not institutionalized or incapable of making a decision. *See* 5 U.S.C. §§ 8377(a), 8451(a)(1)(A) (2000) (either the employee or the agency may initiate an application for disability retirement); 5 C.F.R. §§ 831.1205(a)(3), 844.202(a)(3) (2002) (agency regulations limit conditions under which an agency must initiate a disability retirement application on behalf of an employee, allowing such applications only when an employee is institutionalized or incapable of making his or her own decision and lacking surrogate decision-makers).

for a full law enforcement retirement. Mr. Jones had become eligible for the latter on October 30, 1999.

Counsel for Mr. Jones responded to the DOT/OIG's proposal by letter dated January 13, 2000. Mr. Jones contended, as he does on appeal, that under applicable law the DOT was "without authority to terminate [his] employment so long as he [had] a balance of donated annual leave in his leave account." Apparently in response to an OPM request, counsel for Mr. Jones sent another letter, dated February 3, 2000, in further support of this contention.

By letter to Mr. Jones dated February 8, 2000, DOT issued a final decision removing him from his position, to take effect February 26, 2000. However, DOT subsequently offered to keep Mr. Jones in paid leave status through March 31, 2000, if he filed for retirement as of that date and prior to the effective date of his removal. Mr. Jones chose not to do so but remained in paid leave status until he was removed from his position on February 26, 2000. Mr. Jones timely appealed his removal to the Board.

## C. The Board's decision to uphold the DOT's removal of Mr. Jones

The AJ noted that an agency must establish three elements before it can take an adverse action against an employee, such as its removal of Mr. Jones for physical inability to perform the functions of his position. *Initial Decision* at 2–3. It must prove (i) that the charged conduct occurred, (ii) a nexus with the efficiency of the service, and (iii) that the penalty imposed was reasonable. *Id.* Mr. Jones stipulated that these three elements were met, but raised an affirmative defense—that the DOT was precluded by law from removing him because he had over two years of donated leave yet to be used. *Id.* at 2.

Mr. Jones argued before the AJ that although an agency has discretion to approve or disapprove of an employee's receipt of leave donations, the agency could not, after approving an employee's participation in the Program, terminate an employee while he or she had a positive balance of leave donations received. *Initial Decision* at 9. The AJ rejected this argument, reasoning that the case upon which Mr. Jones relied in making his argument, *Joyner v. Dep't of the Navy*, 57 M.S.P.R. 154 (1993), did not distinguish between approval to enter the Program and approval of the subsequent use of donated leave, but instead only recognized an agency's discretion to decide whether to approve leave usage. *Initial Decision* at 9.

The AJ went on to hold that because the granting of annual leave is normally within the discretion of the employing agency, *see* 5 U.S.C. § 6302(d) (2000), and because the FESLA establishes that an employee may use donated leave "in the same manner as" annual leave, *see id.* § 6333(b), an agency has the same discretion over whether to approve donated leave use as it does over annual leave use. *Initial Decision* at 9–10 (citing additional support in the Preamble to the Final Rule on the Program, 59 Fed.Reg. 67122, 67124 (Dec. 29, 1994)). The AJ thus found "nothing in the law which divests an agency of the authority" to remove an employee simply because they were in the Program, and accordingly upheld the DOT's removal of Mr. Jones. *Id.* at 10.

Mr. Jones petitioned the Board to reconsider the AJ's decision. *Final Decision* at 1. The Board concluded that the petition presented no new, previously unavailable evidence, and that the AJ had made no error of law or regulation that would affect the outcome of Mr. Jones' appeal. *Id.; see* 5 C.F.R. § 1201.115 (2002). The Board therefore denied the petition for review,

thereby rending the AJ's decision final. *Final Decision* at 2. Mr. Jones appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## II. STANDARD OF REVIEW

The scope of this court's review of Board decisions is limited. *Monasteri v. Merit Sys. Prot. Bd.*, 232 F.3d 1376, 1378 (Fed.Cir.2000). Our standard of review for Board decisions is governed by statute, which directs us to set aside Board actions, findings, or conclusions found to be:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) obtained without procedures required by law, rule, or regulation having been followed; or

(3) unsupported by substantial evidence....

5 U.S.C. § 7703(c) (2000).

Our review of the Board's decision requires statutory interpretation, which is a question of law. *Watson v. Dep't of Justice*, 64 F.3d 1524, 1528 (Fed.Cir.1995). We review questions of law *de novo. King v. Dep't of Health & Human Servs.*, 133 F.3d 1450, 1452 (Fed.Cir.1998); *King v. Briggs*, 83 F.3d 1384, 1387 (Fed.Cir.1996).

## III. DISCUSSION

Because it is supported by both the language and the legislative history of the statute under which the Program was established, the Board's interpretation of the Program's statute was not in error and its resolution of Mr. Jones case was not arbitrary, capricious, an abuse of discretion, or otherwise in error.

It is undisputed that Mr. Jones suffered a "medical emergency" within the meaning of 5 U.S.C. § 6331(4). The only issue before this Court is whether the Board properly rejected Mr. Jones' argument that some interpretation of some provision within 5 U.S.C. §§ 6331–40 completely prohibited the DOT from removing him from his position before he had exhausted the leave transferred to him under the Program. To consider Mr. Jones' argument, we must construe the Program's statute.

### A. Construction of the statute establishing the Program

It is axiomatic that statutory construction begins with the language of the statute itself. *See Miller v. Dep't of the Army*, 987 F.2d 1552, 1555 (Fed.Cir.1993). If the language is clear on its face, "there is usually no need to resort to the legislative history underlying the statute." *Reid v. Dep't of Commerce*, 793 F.2d 277, 281 (Fed.Cir.1986). "All statutes must be construed in the light of their purpose." *Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Thus, we must "find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *NLRB v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957). "[W]e look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990).

Within the provisions implementing the Program, §§ 6331–40, we are primarily concerned with: (i) § 6331(4), the definition of the term "medical emergency;" (ii) § 6333, specifying the conditions under

which a Program participant may receive and use donated leave; and (iii) § 6335(a), specifying how a medical emergency terminates. Before turning to each section, we note that we find no text in §§ 6331–40 that directly supports Mr. Jones' argument. His assertions before the Board and on appeal are based on inferences he contends arise from the three provisions to which we turn.

### 1. The definition of "medical emergency" in § 6331(4)

■ Mr. Jones argues that because a medical emergency is defined as a "medical condition ... likely to require the *prolonged absence*" of an employee, the use of the word "prolonged" signals Congress' intent that under any condition an employee should be able to use all donated leave before being removed. 5 U.S.C. § 6331(4) (2000) (emphasis added). We do not view the word "prolonged" as carrying such import. Even if we were to credit Mr. Jones' asserted inference, another structural aspect of the definition of "medical emergency" refutes Mr. Jones' assertion. The definition specifies that the medical condition can be "of an employee *or family member* of such employee." *Id.* (emphasis added). The Program allows an employee to take leave when a family member has the medical condition, but the employee is healthy. If such an employee was on leave because a family member had a medical condition, but was validly removed by the employing agency during such time, nothing in the Program's statute prohibits removal of the employee.

While Mr. Jones roots his arguments in certain provisions of the Program's statute, in part he paints a picture of alleged unfairness if the law allows an employee experiencing a medical emergency to receive donated leave yet does not allow such employee to take advantage of all of the donated leave. Certainly the tragedy in Mr. Jones situation called forth a strong response and desire to help, as evidenced by the generous leave donations. However, the example of an employee who is on leave, but not herself experiencing the medical condition, and who is otherwise validly removed by the employing agency, serves to show that Mr. Jones' legal proposition cannot be true in all cases as he asserts. Further, Mr. Jones does not challenge, and therefore the issue is not before us, whether the DOT acted reasonably in dealing with Mr. Jones. However, it would be difficult to argue that the DOT was completely unreasonable when it approved Mr. Jones' use of nearly five years of the seven years of donated leave.

Our construction of the statutory term "medical emergency" is consistent with the legislative history of the FELSA because it is clear from that history that Congress intended the Program to be a stopgap measure to help an employee until she is able to take advantage of long-term disability retirement. *See, e.g.,* S.Rep. No. 100–437, at 13 (1988) (hereinafter "Senate Report"), *reprinted in* 1988 U.S.C.C.A.N. 3687, 3699 ("[A] medical emergency affecting a leave recipient shall be considered to have terminated ... when the employment of the leave recipient terminates.")

Prior to the creation of the Program, any seriously ill federal employee who had exhausted his or her annual and sick leave, and any advanced leave granted by the employing agency, had essentially three choices: to request leave without pay, to resign his or her position, or to take a disability retirement, if eligible to do so. Senate Report at 2; 1988 U.S.C.C.A.N. at 3688. Choosing between such limited options had the potential to be difficult or even devastating. *Id.;* 1988 U.S.C.C.A.N. at 3688. Similarly situated employees in the private sector might be covered by

short-term disability insurance, which typically replaced between fifty and seventy percent of an employee's lost earnings for a period of up to twenty-six weeks. *Id.;* 1988 U.S.C.C.A.N. at 3688. Leave sharing programs were first established in state and local governments to rectify the absence of a similar option for government employees. *Id.;* 1988 U.S.C.C.A.N. at 3688. It was to such models that Congress looked when fashioning the precepts of the Program. *See id.;* 1988 U.S.C.C.A.N. at 3688.

Thus, similarly, the purpose of the Program was to "close a gap in the federal worker's current disability insurance coverage for personal medical emergencies. It also can be used to allow employees to attend to seriously or terminally ill spouses and dependents." *See id.* at 2–3; 1988 U.S.C.C.A.N. at 3688. And while the FELSA defines a medical emergency as "a medical condition ... likely to require the prolonged absence of such employee from duty," the Program was *"not meant to be a substitute for disability retirement." Id.* at 7; 1988 U.S.C.C.A.N. at 3693 (emphasis added).

In sum, Mr. Jones' arguments based on his asserted definition of the term "medical emergency" do not support his legal assertion that the DOT was prohibited from removing him from his position before he had exhausted the leave donated to him under the Program.

2. *§ 6333—specifying the conditions under which a Program participant may receive and use donated leave*

■ Mr. Jones argues that § 6333(c) supports his proposition because it states first that donated leave "may accumulate without regard to *any limitation*" imposed on the accrual of annual earned leave, 5 U.S.C. § 6333(c)(1) (2000) (emphasis added), and, second, "may be substitut-

ed retroactively for *any period* of leave without pay," *Id.* § 6333(c)(2) (emphasis added). We disagree with Mr. Jones' argument. In both clauses, the word "any" simply means that there is no limit on the donated leave an employee can accumulate for potential use upon the employing agency's approval. Thus, we agree with the AJ's interpretation and with the interpretation offered to DOT/OIG by OPM and the GAO: while leave can accumulate without limit, the employing agency still has discretion to approve or disapprove use of such accumulated leave under the same parameters and law governing an employee's use of annual earned leave. Section 6333(b) explicitly provides as such.

Under § 6333(b), an employee may use donated leave "in the same manner and for the same purposes" as accrued annual leave. § 6333(b). This indicates a clear intent by Congress that while an employee is on medical emergency status, use of accumulated donated leave is still subject to whatever agency approval(s) are required for use of annual earned leave and for use of leave generally. *See, e.g., Campana v. Dep't of the Navy,* 873 F.2d 289, 291 (Fed.Cir.1989) (holding that the authorization of leave without pay is generally a matter of administrative discretion, but that denial of leave without pay must be reasonable under the circumstances).

3. *§ 6335(a)—specifying how a medical emergency terminates*

■ Under the last statutory provision bearing on the issue, Mr. Jones argues that § 6335(a) becomes nonsensical under the AJ's interpretation of § 6335(a)(3). The AJ concluded that § 6335(a)(3) signals Congress' intent to allow for separation of the employee from the service of the employing agency regardless of the status of the medical emergency. Mr. Jones argues that if an agency is allowed to terminate

an employee before the employee has used all of its leave, this writes subsections § 6335(a)(1)-(2) out of § 6335(a). Again, we disagree with Mr. Jones' argument because the plain language of the phrase "is separated from service" in § 6335(a)(3) refers to either voluntary or involuntary separation. Moreover, interpreting § 6335(a)(3) to include involuntary separation still leaves a role for § 6335(a)(1)-(2) in the statutory scheme. The medical condition underlying the medical emergency may diminish or end before either voluntary or involuntary removal, necessitating use of either subsection to notify the respective employee and employing agency that the medical emergency is over.

## B. Application of our interpretation to Mr. Jones' situation

Reviewing the facts of the instant case, we note first that the DOT allowed Mr. Jones to remain on paid leave from the onset of his medical emergency in May 1995 until his removal in February 2000—a span of close to five years. Again, while the reasonableness of the DOT's actions are not before us, this response by the DOT seems obliging to Mr. Jones in light of the Senate Report's suggestion that "agencies should encourage employees to apply for disability retirement if circumstances warrant it." *Id.* at 7; 1988 U.S.C.C.A.N. at 3693.

Mr. Jones argues that the AJ's interpretation, that "separated from service" in § 6335(a)(3) allows for voluntary or involuntary separation, is contrary to interpretations rendered by OPM and the GAO. Mr. Jones correctly points out that a long-standing interpretation given a statute by the agency charged with administering it should be deferred to unless it is unreasonable. *Money v. Office of Pers. Mgmt.*, 811

F.2d 1474, 1477 (Fed.Cir.1987); *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("if the statute [being interpreted] is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute"). However, neither the OPM, the GAO, or the DOT for that matter, have adopted an interpretation of § 6335(a)(3) dissonant from that adopted by the AJ, the Board, and now this court. The opposite is in fact true; both OPM and the GAO's interpretation precisely track the AJ's interpretation.

Furthermore, contrary to Mr. Jones' assertions, OPM's opinion letters to DOT regarding Mr. Jones' case made only four essential points and did not opine that the DOT was without discretion to remove Mr. Jones. First, OPM noted that the statute does not limit the amount of leave that could be transferred to Mr. Jones under the Program. Second, OPM stated that the facts here did not warrant an agency-mandated disability retirement. Third, OPM reasoned that leave transferred to Mr. Jones could not be used toward full retirement eligibility if he were to retire before such rights vested under the applicable regulations. Fourth, OPM opined that agencies have discretion both to approve or deny an employee's application to participate in the Program and to approve or deny requests to use transferred leave. OPM never opined that DOT was forbidden from removing Mr. Jones from his position before he had exhausted the leave transferred to him under the Program. OPM has thus made no interpretation of the provisions in the statute at issue to be given deference over the Board's interpretation of it.[5]

5. Given our holding that the Program's stat- ute clearly does not provide the prohibition

Also undercutting Mr. Jones' argument is the fact that the language of 5 U.S.C. § 6335(a)(3) is paralleled in the regulations OPM promulgated to administer the Program. *See* 5 C.F.R. § 630.910(a)(1) (2002) ("the medical emergency affecting a leave recipient shall terminate ... when the leave recipient's Federal service is terminated"). Another OPM-promulgated regulation also supports the proper interpretation, specifying that the "approval and *use* of transferred annual leave is subject to the conditions and requirements" imposed for annual earned leave. *Id.* § 630.909(c) (emphasis added).

In his reply brief, Mr. Jones implicitly acknowledges the fourth main point in OPM's opinion letters: approval for the use of donated leave takes place via a two-step process. The first step is the agency's approval or disapproval of the employee's participation in the Program. *See* 5 U.S.C. § 6333(a) (2000). The second step is the agency's approval or disapproval of the use of leave donated to the employee. An agency "has the authority to deny an employee's request to *use* shared [*e.g.*, donated] annual leave just as it may deny an employee's request to *use* other annual leave." *See* 59 Fed.Reg. at 67124 (emphasis added).

The DOT could not and has not sought to deny that its November 1995 approval of Mr. Jones' application to participate in the Program constituted the first of these two steps. With regard to the second step, Mr. Jones argues that once an agency approves the accumulation of leave, it has no discretion to rescind use of any of the donated leave. This argument is without support in the law because while there are restrictions on how an employing agency deals with employee leave, these restrictions leave some discretion to the employing agency. *See, e.g., Schultz v. United States Navy,* 810 F.2d 1133, 1137 n. * (Fed.Cir.1987) (indicating that an employee may be removed for excessive absences even though excused); *Smisson v. Dep't of the Air Force,* 85 M.S.P.R. 427, 429–30 (2000) (listing the criteria an agency must satisfy prior to taking an adverse action against an employee based upon the use of approved leave).

Mr. Jones also seems to argue that the DOT's approval of Mr. Jones' participation in the Program embodied an implicit approval for Mr. Jones to use any and all leave donated. Assuming *arguendo* that Mr. Jones' contention is plausible, there is no indication that DOT ever approved Mr. Jones' use of any leave beyond the effective date of his removal. The only place from which such an approval could possibly be inferred is the DOT/OIG's June 1997 letter to Mrs. Jones assuring her that Mr. Jones would "remain in his leave status" barring a contrary opinion of the Comptroller General. Mr. Jones does not argue that such an inference can be drawn

on agency action that Mr. Jones seeks, we do not reach and need not reach the issue of whether the OPM's opinion letters, or interpretation of the statute contained in the Board's opinion, requires *Chevron* deference, or whether *Chevron* deference is appropriate for a statute such as the Program which is primarily administered by OPM but partly administered by the employing agency. *See United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (holding that *Chevron* treatment is appropriate when Congress contemplates ad-

ministrative action, such as adjudication, with the force of law); *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (flagging but leaving unresolved the question of whether enforcement by multiple agencies is incompatible with *Chevron* deference); Merrill & Hickman, *Chevron's Domain,* 89 Geo. L.J. 833, 849 & n. 85 (2001) (discussing agency deference pre-*Chevron* and post-*Chevron* in situations where multiple agencies are charged with administering a statute).

from that letter, but even had he done so, DOT cannot be said to have granted approval of Mr. Jones' indefinite use of donated leave that it would then allegedly have been unable to rescind. In addition, in that very same letter, the DOT/OIG qualified its position by stating that it was only approving use of donated leave through October 1999 when Mr. Jones was eligible for full retirement.

In addition, Mr. Jones attempts to both (i) align his case with *Joyner* on the basis that he and Ms. Joyner were both removed because they were unable to present themselves for the performance of their duties because of physical incapability, and (ii) distinguish his case from *Joyner* on the basis that in his case there was a foreseeable end in sight to Mr. Jones' absence— when the donated leave was exhausted. Both arguments fail.

 As to the first argument, the Board correctly noted that Ms. Joyner was removed for being absent without leave, while Mr. Jones was removed for inability to perform his duties. Mr. Jones' second argument distorts the meaning of *Joyner's* note that "an agency may initiate a nondisciplinary removal action where the employee is absent and there is no foreseeable end to such absence." *Joyner*, 57 M.S.P.R. 154, 160 n. 7 (1993) (citing *Ward v. General Svcs. Admin.*, 28 M.S.P.R. 207, 209 (1985)). Viewed in its proper context, the "foreseeable end" of an employee's absence refers to whether and when that employee would again be capable of performing the duties and functions of his or her position. *See Ward*, 28 M.S.P.R. at 209 (noting that since Ms. Ward had ad-

mitted that her condition rendered her unable to return to work and that there was no indication of any date by which she could return to duty, her absence had no foreseeable end). Here the DOT used proper procedures and established that it was medically unlikely, at the very least, that Mr. Jones would ever be able to perform the necessary physical duties of the position from which he was removed. Accordingly, there is no foreseeable end to his absence.[6]

 Finally, as to the parties' arguments regarding the effect of *Smisson v. Department of the Air Force*, 85 M.S.P.R. 427 (2000), on the present case, we begin by saying that decisions of the Board are, of course, not binding authority upon this court. But in any event, *Smisson* speaks to the circumstances under which an exception is allowed from the general rule that an agency's approval of leave precludes the agency from taking an adverse action based on those absences. *Id.* at 429 (citing *Holderness v. Defense Commissary Agency*, 75 M.S.P.R. 401, 404 (1997) for support of the general rule). Here, however, because the removal was for physical inability to perform the functions of his job, the DOT did not base its removal of Mr. Jones on his use of absences which it had already approved, nor on the future use of leave donated to him under the Program—the indefinite use of which DOT never approved. Rather, the AJ correctly noted that the issue was whether the removal was proper and whether the DOT's removal action was in some way precluded by the existence of a positive donated leave

---

**6.** Mr. Jones also argues that *Wade v. Dep't of the Navy*, 829 F.2d 1106 (Fed.Cir.1987) supports his position. In *Wade*, we held that an agency was required to grant sick leave before taking adverse action against the employee when there was no dispute that absences at issue were due to the employees illness. *Id.* at 1109–10. We do not find *Wade* on point because the Program's statute specifically instructs us to treat donated leave as annual leave, 5 U.S.C. § 6333(b), and *Wade* only applies to an employee's accrued earned sick leave.

balance. Under our construction of the Program's statute and the other authority and circumstances bearing on this issue, we find that *Smisson* is not on point and does not countermand Congress' clear intent that donated leave be treated as annual earned leave and that a medical emergency can properly end when an employee is validly separated from service, even if such separation is involuntary.

## IV. CONCLUSION

■ The Program's statute does not contain a prohibition against an employing agency exercising discretion to approve use of donated leave. Rather, it explicitly specifies that donated leave is to be treated similar to annual earned leave. This court has previously noted that "[a]n agency is not required ... to indefinitely retain an employee on its rolls who cannot work due to poor health." *Schultz*, 810 F.2d at 1137 n. *. Thus, neither the Program's statute or our case law support Mr. Jones' affirmative defense raised before the Board and appealed here. Although Mr. Jones' circumstances are tragic, we cannot say that the final decision of the Board in this case was erroneous. That decision is therefore

*AFFIRMED.*

No costs.