Kelly BUTTERBAUGH, Roseanne T. Faltin, John C. Marderness, Robert J. Bono, Petitioners,

v.

DEPARTMENT OF JUSTICE, Respondent.

No. 02–3331.

United States Court of Appeals, Federal Circuit.

July 24, 2003.

Joe Goldberg, American Federation of Government Employees, of Washington, DC, argued for petitioners.

Lauren S. Moore, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. On the brief were Robert D. McCallum, Jr., Associate Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Kevin W. McArdle, Attorney. Of counsel was James M. Kinsella, Assistant Director.

Before MAYER, Chief Judge, CLEVENGER and BRYSON, Circuit Judges.

Opinion of the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge BRYSON.

CLEVENGER, Circuit Judge.

Kelly Butterbaugh, Roseanne T. Faltin, John C. Marderness, and Robert J. Bono ("Petitioners") appeal the decision of the Merit Systems Protection Board ("Board"), which held that Petitioners' employer, the Department of Justice ("Department" or "agency"), acted permissibly in charging Petitioners' military leave allowance for days on which they were not scheduled to work, but they spent training with the military reserves. *Butterbaugh v. Dep't of Justice*, 91 M.S.P.R. 490 (2002). The Board concluded that the "15 days" of paid reserve training leave granted by 5 U.S.C. § 6323(a)(1) refers to 15 calendar days of military training, not to 15 workdays. We conclude, based on the text of the statute, that federal employees need take military leave only for those days on which they are required to work, and that section 6323(a)(1) thereby grants up to 15 workdays of military leave. We therefore reverse the decision of the Board and remand for further proceedings.

## I

### A

Petitioners are full-time employees of the Department of Justice, Bureau of Prisons, at the Federal Correctional Institution in Loretto, Pennsylvania. Petitioners are also members of the military reserves. Like other reservists, Petitioners are required to attend military training sessions each year. By statute, 5 U.S.C. § 6323(a)(1) (2000), federal employees are granted up to "15 days" of paid leave to attend reserve or National Guard [1] training.

Prior to 2000, the Department, as other federal agencies had done for decades, had included days on which employees were not scheduled to work (e.g., weekends and holidays) when calculating how much military leave employees took. For example, an employee (with a Monday–Friday workweek) attending reserve training from one Friday through the next would be charged for eight days of military leave, even though the employee was absent for only six workdays. Thus, the agency measured the grant of military leave by the number of calendar days employees spent in reserve training, rather than by the number of workdays on which they were absent from work.

At least in part due to this accounting practice, Petitioners complain that they were forced to supplement their statutory military leave with other leave time to meet their reserve training obligations. Petitioners assert that they took annual leave or leave without pay in order to serve the full period of their reserve training.[2]

---

1. We use the terms "reservist" and "reserve training" to encompass National Guard members and obligations as well.

2. The limited record before us indicates that petitioner Bono requested and was granted leave without pay to attend reserve duty. The record does not indicate whether other Petitioners used annual leave or leave without pay to fulfill their reserve training requirements.

In 2000, Congress amended section 6323 to add subsection (a)(3), which states: "The minimum charge for leave under this subsection is one hour, and additional charges are in multiples thereof." 5 U.S.C. § 6323(a)(3) (2000). Although neither the amendment nor any legislative history accompanying the amendment addressed or altered the grant of "15 days" of leave in section 6323(a)(1), the Office of Personnel Management ("OPM") determined that, in light of the new subsection, section 6323(a)(1) could no longer be interpreted to charge non-workdays against federal employees' military leave:

> Based on new section 6323(a)(3), it is clear that Congress recognizes an 8–hour civilian workday as the basis for accruing 1 day of military leave and that there is no intent to charge an employee military leave for the hours that he or she would not otherwise work.... Members of the Reserves and/or National Guard will no longer be charged military leave for non-duty days (typically weekends and holidays) that occur within the period of military service.

Memorandum for Human Resources Directors, Office of Personnel Management (Jan. 25, 2001). The Department, like other federal agencies, changed its military leave policy to conform to OPM's new interpretation. Thus, Petitioners' grievances relate to past and not current agency policies.

### B

Petitioners filed complaints with the Board, alleging that the agency's pre–2000 practice of charging their military leave for non-workdays, and thereby forcing them to use other leave to complete reserve training, violated the Uniformed Services Employment and Reemployment Act of 1994 (USERRA), 38 U.S.C. §§ 4301–4333 (2000), by denying them a benefit of employment based on their military service. In an Initial Decision, the Board's adminis-

trative judge ruled that (1) the Board lacked jurisdiction over Petitioners' claim, because the agency had actually granted them their military leave and therefore their appeal did not allege the denial of a benefit of employment under USERRA; and (2) if the Board had jurisdiction, the agency had a legitimate, nondiscriminatory reason for its leave policy, because the agency was merely following OPM's guidance in charging non-workdays against military leave. *Faltin v. Dep't of Justice,* Nos. PH3443010135–I–1, –0134–I–1, –0136–I–1, –0137–I–1 (Merit Sys. Prot. Bd. Apr. 24, 2001).

Petitioners sought review of the administrative judge's initial decision by the full Board. Contrary to the administrative judge, the full Board determined that it had jurisdiction over the appeal, because Petitioners had made a nonfrivolous allegation under USERRA that they had been denied a benefit of employment due to their reserve service. *Butterbaugh,* 91 M.S.P.R. at 494–95. However, the Board ruled that the Department's practice of charging non-workdays against military leave did not deprive Petitioners of a benefit of employment because, as a matter of statutory interpretation, the Board held that the grant of "15 days" of leave in 5 U.S.C. § 6323(a) meant 15 calendar days of leave, not 15 workdays. Hence, agencies were properly charging Petitioners for all days they spent in military training, whether or not those days were workdays. The Board reached this conclusion beginning with the observation that the ordinary and accustomed meaning of "day" is a calendar day, indicating that section 6323(a)(1) grants calendar days of leave. Further, for purposes of subchapter I of title 5, chapter 63, Congress specifically defined "day" to be a workday, 5 U.S.C. § 6302(a), but did not do so for subchapter II. This suggested to the Board that Congress did not intend for "day" to mean

workday in subchapter II, where section 6323(a) is found. Moreover, Congress specifically used "workdays" in the sections of the statute granting extended active duty leave for reservists (sections (b)(1) and (d)(1) of section 6323), showing that Congress knew how to specify workdays when it chose to.

Finally, the Board extensively reviewed the history of the leave statutes:

Before 1899, full-time civilian federal employees were generally charged annual and sick leave for intervening non-workdays that occurred during a period of leave. The rationale for that policy was apparently twofold: first, that days generally refers to calendar days, including weekends and holidays; and, second, that Congress intended that employees, who were then paid for every day, including weekends and holidays, receive one month's vacation with the time expressed in days because of the varying lengths of the calendar months.

An 1899 act provided, for the first time, that annual leave shall be charged exclusive of non-workdays. That statute did not apply to sick leave and sick leave continued to be charged for intervening non-workdays.

The first statute specifically granting civilian federal employees military leave of up to 15 days a year for training was enacted in 1917. Act of May 12, 1917, ch. 12, 40 Stat. 40 (1917). That statute did not state whether intervening non-workdays during a period of military leave were to be charged as leave, and in the absence of such language, military leave was administered consistent with the pre–1899 policy of charging annual leave and the then-existing policy for charging sick leave.

In 1951, Congress completed a significant overhaul of the federal leave system and defined "days" for purposes of annual and sick leave as being exclusive of non-workdays. Act of Oct. 30, 1951, Title II, 65 Stat. 679 (1951). As discussed above, however, that definition was only applied to what would become codified as subchapter I of title 63. Thus, for military leave purposes, "days" retained its ordinary meaning that the term had for all types of leave prior to the 1899 statutory change.

The Civil Service Commission incorporated the long-standing practice for charging military leave into the Federal Personnel Manual and the record contains a copy of the relevant provision from 1963. When the Civil Service Commission was abolished and the Office of Personnel Management was created pursuant to the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111, the Office of Personnel Management retained the provision, which the Bureau of Prisons incorporated into its leave policy.

Despite making various changes to the military leave system in the last 40 years, Congress did not address the way military leave was charged until 2000. See, e.g., Pub.L. No. 104–106, 110 Stat. 186 (1996) (authorizing military reserve technicians up to 44 workdays a year to participate in noncombat operations outside of the United States); Pub.L. No. 102–190, 105 Stat. 1290 (1991) (increasing the duties for which reservists are entitled to take military leave from federal employment); Pub.L. No. 96–431, 94 Stat. 1850 (1980) (making military leave available on a fiscal rather than calendar year basis and allowing the limited carrying over of military leave to future years); Pub.L. No. 90–588, 82 Stat. 1151 (1968) (authorizing 22 days paid leave when a reservist or National Guardsman is activated to enforce the law).

*Butterbaugh,* 91 M.S.P.R. at 497–99 (footnotes, citations, and paragraph numbers omitted). The Board inferred from this history that Congress approved of the way federal agencies had been administering section 6323(a)(1). According to the Board, because Congress is presumed to know of administrative interpretations of a statute when it re-enacts a statute without change, *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), Congress would have acted to correct any administrative misinterpretation of section 6323(a)(1) when it revisited the military leave system in 1968, 1980, 1991, and 1996. Given that Congress took no such action until 2000, when it supposedly changed the interpretation of section 6323(a)(1) by adding section 6323(a)(3), the Board concluded that the long-standing practice of charging non-workdays against federal employees' military leave had met with Congress's approval.

Petitioners appeal the decision of the Board. We exercise jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(9).

## II

Our review of the Board's decisions is circumscribed by statute. We must set aside findings or conclusions of the Board that we find to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule or regulation having been followed; or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (2000). For purposes of this appeal, neither side contests the Board's determination that Petitioners have alleged denial of a benefit of employment due to their performance of military duties, there-

by alleging a USERRA violation by an executive agency actionable to the Board under 38 U.S.C. § 4324(b)(1). *See Yates v. Merit Sys. Prot. Bd.,* 145 F.3d 1480, 1483 (Fed.Cir.1998). Moreover, we agree with the Board that, in contrast to cases such as *Sheehan v. Department of the Navy,* 240 F.3d 1009, 1013–14 (Fed.Cir.2001), the question in this case is not whether Petitioners' military status was a substantial or motivating factor in the agency's action, for agencies only grant military leave to employees who are also military reservists.

■ The issue, as the Board perceived, is the correct interpretation of 5 U.S.C. § 6323(a)(1): Petitioners cannot claim they were denied a benefit of employment if the Department granted them the full measure of leave due to them under section 6323(a)(1).[3] Accordingly, the only issue we must decide is whether the Board correctly interpreted 5 U.S.C. § 6323(a)(1). The Board's interpretation of a statute is a determination of law that we review de novo on appeal. *Marano v. Dep't of Justice,* 2 F.3d 1137, 1141 (Fed.Cir.1993).

## III

### A

The leave statute in question reads as follows, with the language in dispute emphasized:

Subject to paragraph (2) of this subsection [pertaining to part-time employees], an employee as defined by section 2105 of this title or an individual employed by the government of the District of Columbia, permanent or temporary indefinite, is entitled to leave without loss in pay, time, or performance or

---

**3.** To conclude otherwise would be to conclude that USERRA mandates federal agencies to provide employees with unlimited military leave, irrespective of the detailed statutes granting federal employees specific periods of leave for training or active duty. We find no indication that Congress intended to blot out the military leave statutes when it passed USERRA.

efficiency rating for active duty, inactive-duty training (as defined in section 101 of Title 37), funeral honors duty (as described in section 12503 of title 10 and section 115 of title 32), or engaging in field or coast defense training under sections 502–505 of title 32 as a Reserve of the armed forces or member of the National Guard. *Leave under this subsection accrues for an employee or individual at the rate of 15 days per fiscal year* and, to the extent that it is not used in a fiscal year, accumulates for use in the succeeding fiscal year until it totals 15 days at the beginning of a fiscal year.

5 U.S.C. § 6323(a)(1) (2000) (emphasis added).

■ The unadorned language of a statute is, as always, our starting point for statutory interpretation. *Turtle Island Restoration Network v. Evans*, 284 F.3d 1282, 1291 (Fed.Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 1748, 155 L.Ed.2d 511 (2003). The government, as did the Board, views this case as largely controlled by the language "15 days per fiscal year" in section 6323(a)(1). Amassing a wealth of authority maintaining that the plain and ordinary meaning of "day" is 24 hours, or one calendar day, the government argues that leave accruing at "15 days" per year must therefore accrue at 15 calendar days per year, not 15 workdays.

■ We agree that the ordinary meaning of "day" is a calendar day, and that the leave granted by section 6323(a)(1) accumulates at the rate of 15 calendar days per fiscal year. But to leap from this premise to the conclusion that non-workdays are properly chargeable against military leave begs the question at the heart of this case: whether an employee must be answerable to the government at all for time that he or she is not required to work. If one does not need leave from the government to attend reservist training on one's own time, then leave time measured in calendar days is no different than leave time measured in workdays. As a general matter, employees are not accountable to their employers for time they are not required to work. We see no reason why federal employees need military leave for days on which they are not scheduled to work.

To put it another way, the "days" that section 6323(a)(1) refers to are *leave* days, not "training days" or "reserve duty days." The statute purports to measure how many days of paid leave employees are entitled to, not how many days of reserve training they may attend. The result might be different if the statute provided that federal employees were entitled to attend 15 days of *reserve training* per fiscal year, in which case the amount of leave would clearly be measured by the period of reserve training. Indeed, this interpretation may have been correct for the original version of section 6323(a) enacted in 1966, which provided that a federal employee "is entitled to leave without loss of pay ... *for each day*, not in excess of 15 days in a calendar year, *in which he is on active duty or is engaged in field or coast defense training* ...." 5 U.S.C. § 6323(a) (1976) (emphases added).[4] Leave days were thus granted according to the actual period during which an employee was on duty, subject to a 15-day maximum.

But in 1980, in the course of revising section 6323(a) to grant leave by the fiscal year rather than by the calendar year,

---

4. Likewise, the predecessor Act of May 12, 1917, ch. 12, provided that federal employees were "entitled to leave of absence from their respective duties, without loss of pay ... on all days during which they shall be ordered to duty with troops or at field exercises, or for instruction, for periods not to exceed fifteen days in any one calendar year." 40 Stat. 40, 72 (1917).

Congress rephrased the statute into its present form, providing that leave "accrues for an employee or individual *at the rate of 15 days* per fiscal year. . . ." Pub.L. No. 96–431, 94 Stat. 1850 (1980) (emphasis added). In so doing, Congress changed the computation of leave days from a variable measurement pegged to the actual length of military training, to a constant measurement of 15 days. While leave computed by the actual period of reserve training necessarily includes non-workdays in the calculation, leave measured by an absolute number of days (15) does not. We therefore conclude that, at least since 1980, the statutory text of 5 U.S.C. § 6323(a)(1) has granted federal employees leave with pay for 15 days on which they would ordinarily be performing their duties for the federal government, rather than leave with pay for a training period of 15 days including days on which they were not required to work.

In light of the foregoing discussion, it is largely irrelevant whether the term "days" in section 6323(a)(1) means "workdays" or "calendar days." But even assuming that the choice between "workday" and "calendar day" is dispositive in this case, we are not persuaded that the "days" of section 6323(a)(1) must be calendar days. The government contends that Congress knew how to distinguish between "days" and "workdays," as in 5 U.S.C. § 6302(a), which explicitly defines "days" as *workdays* for purposes of subchapter I of title 63. Because Congress made no such provision for subchapter II, in which section 6323(a)(1) resides, the government argues that Congress by implication retained the ordinary meaning of "day" for purposes of subchapter II. Likewise, the government argues that Congress specifically used the term "workdays" in the active duty leave provisions of section 6323(b) and (d)(1), which demonstrates that Congress uses the specific term "workday" when it in-

tends for leave to be measured in workdays.

Ordinarily, the government's argument for consistency in statutory interpretation might carry considerable weight. However, Petitioners direct our attention to another leave statute residing in subchapter II of title 63, section 6326, which grants federal employees three days of paid leave to attend the funeral of an immediate relative who died in combat while serving in the armed forces. 5 U.S.C. § 6326 (2000). Section 6326 simply grants "three days of leave," which, according to the government's argument, is universally understood to mean calendar days rather than workdays. Moreover, Congress enacted the funeral leave statute at the same time it enacted the active duty leave provision of section 6323(b), and we see in those statutes the same distinction between "days" of funeral leave and "workdays" of active duty leave. 5 U.S.C. §§ 6323(b), 6326; S.Rep. No. 90–1443 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4288. One would therefore conclude that section 6326 grants three calendar days of funeral leave, not three workdays. Yet immediately upon section 6326's passage, OPM's predecessor (the Civil Service Commission), acting by formal rulemaking and pursuant to explicit statutory authority, promulgated a regulation interpreting section 6326 to grant "3 workdays" of paid funeral leave. 5 C.F.R. § 630.804 (1968). That regulation has remained unchanged to this day. *See* 5 C.F.R. § 630.804 (2003).

█ If OPM, acting with the full majesty of formal rulemaking, has declared "day" in section 6326 to mean "workday," then it is not apparent why "day" in section 6323(a)(1) should not. While consistency is not necessarily the paramount imperative of statutory interpretation, we, like other courts, are close-minded enough to expect that administrative agencies or-

dinarily will construe the same term in closely related statutes consistently. *See, e.g., Dep't of Revenue of Or. v. ACF Indus., Inc.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994); *Beliveau v. Dep't of Labor,* 170 F.3d 83, 87 (1st Cir.1999). The government, despite invitations from this court, cannot offer any rationale why "day" should mean "workday" for purposes of 5 U.S.C. § 6326 but not for 5 U.S.C. § 6323(a)(1). Absent such a rationale, it would seem arbitrary and capricious for the government to count non-workdays when computing military leave, but not when computing other kinds of leave.

But the government's treatment of non-workdays was not even consistent within the military leave statute itself. Under the pre–2000 interpretation of section 6323(a)(1), employees were charged military leave for non-workdays in the middle of a training period, but not for non-workdays at the beginning or end of the training period. *See To the Sec'y of the Army,* 27 Comp. Gen. 245, 253 (1947). For example, an employee with a Monday–Friday work schedule who attended reserve training from one Saturday to the next was charged for five days of military leave, because his non-workdays bookended the training period and therefore did not count against her military leave. In contrast, a similarly situated employee with a Thurs-day to Monday schedule (having Tuesdays and Wednesdays off) was charged the full eight days of leave for a Saturday to Saturday training session, because his non-workdays fell entirely within the training period and were counted against his leave. As was the case for the discrepancy between funeral leave and military leave, the government is unable to articulate any rationale why some non-workdays counted as "days" under the former interpretation of section 6323(a)(1), but some did not. These inconsistencies do not compel Petitioners' view of the statute. However, they largely negate the force of the government's argument based on the distinction between "day" and "workday." We therefore adhere to our conclusion that the text of section 6323(a)(1) does not support the charging of non-workdays against military leave.[5]

## B

While we conclude that Petitioners have the better reading of the statutory text, we concede that section 6323(a)(1) may be susceptible to more than one interpretation. Because the will of Congress may not have been expressed unequivocally, we therefore consider whether Congress delegated to the Department authority to interpret section 6323(a)(1), entitling the Department's interpretation to a claim for judicial

---

5. We think the government's textual arguments are further undermined by Congress's 2000 amendment adding section 6323(a)(3), or more precisely, by OPM's about-face in its interpretation of section 6323(a)(1) in response to that amendment. The amendment left the foundation for all the government's textual arguments untouched. Congress left intact the word "day," which we are told has an ordinary and accustomed meaning. The contrast between the "day" of section 6323(a) and the "workdays" of subchapter I and sections 6323(b)(1) and (d)(1) remains. Congress indicated no disagreement with many decades of administrative practice and Comp-troller General opinions. Yet now, according to OPM, "day" in section 6323(a)(1) means "workday." It requires some effort to derive such a new interpretation solely from Congress's mandate to compute leave time in intervals of one hour, especially given that hourly computation for part-time employees under section 6323(a)(2) has cohabited comfortably with section 6323(a)(1) since 1980. While we do not begrudge agencies the opportunity to change their minds, it is difficult to believe that OPM could have revised its interpretation if the government's textual argument had any genuine appeal.

deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The government in particular contends that the Department may assume the mantle of OPM's interpretive authority (given that the Department has merely followed OPM's policy guidance), and that OPM's interpretation of the statute is entitled to *Chevron* deference on account of OPM's general authority to administer the federal personnel system. However, we conclude that the Department's policy is not entitled to *Chevron* deference, either on its own or by deference inherited through OPM.

Putting aside the question of whether the Department may lay claim to any deference that would be accorded to OPM, *see Jones v. Dep't of Transp.*, 295 F.3d 1298, 1307 n. 5 (Fed.Cir.2002), there remains the problem that OPM lacks explicit authority to administer section 6323(a)(1). Although the absence of express rule-making authority is not dispositive, "a very good indicator of delegation meriting *Chevron* treatment" may be found in express congressional authorization to engage in formal rulemaking. *United States v. Mead Corp.*, 533 U.S. 218, 229–31, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Section 6323 is notable for the absence of explicit OPM rulemaking authority. While Congress specifically gave OPM authority over all other subchapters of chapter 63, *see* 5 U.S.C. §§ 6311 (subchapter I, annual and sick leave), 6332 (subchapter III, voluntary leave transfers), 6362 (subchapter IV, leave bank program), 6387 (subchapter V, family and medical leave), no such provision gives OPM authority over subchapter II, in which section 6323 appears. *Within* subchapter II, Congress granted rulemaking authority to OPM to administer sections 6322 (jury and witness leave), 6326 (funeral leave), and 6327 (bone marrow or organ donor leave), but not section 6323. Admittedly, this pattern might reflect

nothing more than the historical accretion of the leave statutes, for several other provisions of subchapter II also lack a grant of authority to OPM. Nonetheless, the notable absence of explicit rulemaking authority must be weighed when determining whether the agency is entitled to *Chevron* deference.

More significantly, neither the Department nor OPM has (under any other statutory authority) promulgated a formal rule setting forth its implementation of section 6323. In response to an inquiry from Petitioners' union, the Department indicated that its policy of charging reservists' military leave for non-workdays was embodied in the Department's "Time and Attendance Reporting Handbook," and the "OPM Military Leave website." The record shows that the Department's position was earlier set forth by "DOJ Order 1630.1B," dated July 22, 1991, while OPM's interpretation, as described by the Board, derived from the now-retired Federal Personnel Manual promulgated by the former Civil Service Commission, and from published and unpublished Comptroller General opinions issued in response to particular agency inquiries.

■ These sources are perhaps quintessential examples of "policy statements, agency manuals, and enforcement guidelines" which lack the force of law and are not entitled to *Chevron* deference. *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Like the absence of specific congressional authorization, the absence of notice-and-comment rulemaking does not conclusively foreclose *Chevron* deference, *see Barnhart v. Walton*, 535 U.S. 212, 221–22, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *Mead*, 533 U.S. at 230–31, 121 S.Ct. 2164, but this court has made clear that agency personnel policies embodied in informal sources such as handbooks and directives,

including those originating in the Federal Personnel Manual, do not ordinarily merit *Chevron* deference. *James v. Von Zemenszky*, 301 F.3d 1364, 1365–66 (Fed.Cir. 2002) (denial of rehearing); *James v. Von Zemenszky*, 284 F.3d 1310, 1318–19 (Fed. Cir.2002).

While the government does not actually attempt to distinguish *Von Zemenszky* from the present case, we interpret the government's emphasis on the historical interpretation of the leave statutes as an argument that *Chevron* deference is warranted here due to the long-standing and consistent interpretation of section 6323(a) and its predecessors. As noted by the Board, federal employees historically were charged leave for intervening non-workdays falling within a period of leave, and the government directs us to Comptroller General opinions stretching back to 1930, all opining that reservists must be charged military leave for non-workdays occurring within the period of their absence. *Matter of: Military Leave*, B–246,359, 71 Comp. Gen. 513 (1992); *To the Attorney Gen.*, B–133,674, 1957 WL 1556 (Comp.Gen. Dec.30, 1957); *To the Postmaster Gen.*, 9 Comp. Gen. 448 (1930).

The government does not suggest exactly why a long-standing administrative construction should be accorded more deference than those of more recent vintage. There is considerable logic to the position that, once *Chevron* ceded to administrative agencies the power to select a permissible statutory construction in pursuit of policy goals, it became irrelevant whether the agency had adhered to that interpretation in the past, and for how long. *See Barnhart*, 535 U.S. at 226, 122 S.Ct. 1265 (Scalia, J., concurring in part and concurring in the judgment). Nonetheless, the Supreme Court continues to accord extra deference to long-standing interpretations in the *Chevron* inquiry, *see Barnhart*, 535 U.S. at 220–21, 122 S.Ct. 1265, just as it has suggested that shifting interpretations are entitled to less, *see Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993). Perhaps long-standing interpretations are thought more likely to be the result of reasoned agency deliberation rather than political expediency, though if the political branches are entrusted to implement policy there seems little reason to distinguish between the former and the latter.

Here, however, the stability of the government's interpretation does not overcome the lack of explicit congressional delegation or the absence of formal regulations. First, as we explain above, the operative element of the statutory text changed in 1980, when Congress revised the measure of the grant from days of training to days of leave. While subsequent pronouncements from OPM and the Comptroller General continued to rely on their older manuals and opinions for the interpretation that non-workdays should be charged against military leave, Congress's revision of the statutory text undermined the foundation of those older opinions.

Second, the long-standing interpretation of section 6323(a) was never exposed to the light of formal rulemaking, but remained embedded in policy statements, handbooks, directives and the like. The agency interpretation here contrasts with those in cases such as *Barnhart*, in which the Court concluded that *Chevron* deference was necessary because the agency's interpretation was set forth in a formal regulation promulgated pursuant to statutory authority. *Barnhart*, 535 U.S. at 217, 122 S.Ct. 1265. The stability of the agency interpretation at stake in *Barnhart* may have answered criticisms that the agency's position was newly-minted in response to litigation, *id.* at 221, 122 S.Ct. 1265, but it was not otherwise significant in the *Chev-*

*ron* analysis. We explained in *Von Zemenszky* that, absent "special circumstances," factors such as "the length of time over which the agency has considered the question" do not confer *Chevron* deference on personnel policies embodied in informal directives and handbooks. 301 F.3d at 1366. We find no special circumstances here that would overcome the ordinary reluctance to accord *Chevron* deference to informal agency interpretations.

■ An informal agency interpretation may nonetheless claim a lesser degree of deference "proportional to its 'power to persuade,'" depending on such factors as its thoroughness, logic, expertness, and fit with prior interpretations. *Mead*, 533 U.S. at 235, 121 S.Ct. 2164 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Here, as we explain above, the government has been unable to propose any rationale or circumstance, other than the ossification of the statutory interpretation itself, that would support a claim for *Skidmore* deference. We conclude that any deference owed to OPM or the Department under *Skidmore* does not suffice to outweigh the contrary conclusions we draw from the statutory text.

### C

■ Aside from principles of administrative deference, the government advances an independent reason why age may grace a statutory interpretation with additional persuasive force: namely, that Congress may be presumed to know of long-standing administrative or judicial constructions, and to adopt that interpretation when it re-enacts a statute without change. *See, e.g., Lorillard*, 434 U.S. at 580–81, 98 S.Ct. 866. But congressional inaction is perhaps the weakest of all tools for ascertaining legislative intent, and courts are loath to presume congressional

endorsement unless the issue plainly has been the subject of congressional attention. *See Solid Waste Agency of N. Cook County v. Army Corps of Eng'rs*, 531 U.S. 159, 169–70, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). Extensive hearings, repeated efforts at legislative correction, and public controversy may be indicia of Congress's attention to the subject. *Id.; Lanehart v. Horner*, 818 F.2d 1574, 1579 (Fed.Cir. 1987).

While there is some evidence of congressional awareness here, we do not find it sufficient to establish congressional approval of the Department's interpretation of the statute. As noted by the Board, when Congress enacted Pub.L. No. 90–588, granting funeral leave (5 U.S.C. § 6326) and extended active duty reserve leave (5 U.S.C. § 6323(b)), the Senate Report accompanying the legislation voiced concerns that federal employees were not being granted enough leave for reserve training. The Post Office and Civil Service Committee directed the Civil Service Commission to prepare a report on the matter. S.Rep. No. 90–1443 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4288, 4289. The Commission's report, discussing summer encampment training periods, stated that "military leave is charged for intervening scheduled nonworkdays but not for scheduled nonworkdays at the beginning or end of a period of active duty." *Improve Administration of Leave System for Federal Employees: Hearings on H.R. 12602 Before the House Comm. on Post Office and Civil Serv.*, 92d Cong. 27 (1972) (report of the Civil Service Commission).[6] The Commission's report further noted that federal employees' most frequent complaints about the military leave system were "(1) military leave charges should be made for workdays, not calendar days, and (2) military leave should be granted on a

---

**6.** H.R. 12602 did not concern military leave.

fiscal year, not a calendar year basis." *Id.* at 28. The Commission counseled Congress against acting on either of these complaints. *Id.* at 29. And Congress took no action to alter the military leave system until 1980, when its revisions of section 6323(a) changed the measurement of leave days and established the fiscal year as the basis for military leave. Congress made further minor amendments to section 6323 in 1991, 1994, 1996, and 1999, but left section 6323(a)(1) untouched until 2000, when it added the one-hour minimum charge provision that induced OPM to revise its interpretation of the statute.

None of this history rises to the level that would indicate congressional understanding of or acquiescence to the administrative interpretation of section 6323(a)(1). While the Civil Service Commission report disclosed, at least to the Post Office and Civil Service Committees of Congress, that federal employees were being charged military leave for non-workdays falling within a period of military training, there is nothing in any of the legislative history demonstrating that Congress, individually or collectively, knew of or was concerned with this aspect of the leave system. Nor were there any legislative attempts to change the computation of leave days, the failure of which might indicate Congress's satisfaction with the status quo. Moreover, to the extent that Congress's 1980 amendment rendered the historical interpretations of section 6323(a)(1) untenable, it cannot be said that Congress re-enacted the statute without change. While there is no direct indication that Congress's 1980 amendment was intended to compel the exclusion of non-workdays from military leave, that amendment upset the textual basis of the historical interpretation of the leave statute. We therefore cannot conclude that Congress has acquiesced to or endorsed the former administrative interpretation of section 6323(a)(1)'s current text.

## CONCLUSION

For the reasons set forth above, we conclude that 5 U.S.C. § 6323(a)(1) cannot be interpreted to require federal employees to expend military leave days for reserve training days on which they were not required to work. Accordingly, the full Board should have granted the petition for review on the ground that the decision of the administrative judge was based on an erroneous interpretation of the statute. We therefore reverse the decision of the Board and remand the case for further proceedings.

## COSTS

No costs.

*REVERSED AND REMANDED.*

BRYSON, Circuit Judge, dissenting.

I respectfully dissent. In my view, the Merit Systems Protection Board was correct to conclude that, in light of the historical background of the military leave statute, the four petitioners were not denied military leave to which they were entitled.

This case turns on the meaning of the allowance of 15 days per year for military leave in the version of 5 U.S.C. § 6323 that was in effect before the statute was amended in 2000. The court states that the question in this case is "whether an employee must be answerable to the government at all for time that he or she is not required to work," and then answers that question by stating: "As a general matter, employees are not accountable to their employers for time they are not required to work. We see no reason why federal employees need military leave for days on which they are not scheduled to work." But that is not a fair characteriza-

tion of the question presented in this case. The version of the military leave statute that was applied to the petitioners in this case did not require them to be "accountable" to the government for days on which they were not required to work. The statute simply provided a set period of time during which Congress wanted to ensure employees would receive paid leave from their civilian jobs for purposes of engaging in military training. The question in this case is how to calculate that period. Based on an imposing amount of evidence, the Merit Systems Protection Board concluded that Congress intended the period to be calculated by counting from the beginning of the military leave period to the end, without skipping intervening non-workdays. Reaching the proper result in this case requires us to decide what Congress intended with respect to a question of counting mechanics; it does not require us to conclude that Congress viewed federal employees on military leave as "accountable" to the government for days that they did not work. Moreover, the fact that the court finds the Board's interpretation of the statute to be contrary to general leave practices in employment, including federal civilian employment, ignores the fact that, at the time the military leave statute was enacted, the "general" practice to which the court alludes was the exception, not the rule.

## A

Before 1899, federal civilian employees were charged annual and sick leave for all calendar days, including non-workdays, that occurred during the leave period. *See* Act of Mar. 3, 1883, ch. 126, § 4, 22 Stat. 531, 564 (authorizing a "leave of absence ... which shall not exceed thirty days in any one year"); Act of Mar. 3, 1893, ch. 211, § 5, 27 Stat. 675, 715 (authorizing heads of departments to grant 30 days' annual leave and 30 days' sick leave annually to employees); Act of Mar. 15, 1898,

ch. 68, § 7, 30 Stat. 277, 316–17 (authorizing "thirty days' annual leave with pay in any one year," which period may be extended because of illness by an additional period "not exceeding thirty days in any one case or in any one calendar year"); Act of July 7, 1898, ch. 571, 30 Stat. 652, 653 (clarifying that a period of 30 days' annual leave may be granted to an employee who has had no more than 30 days' leave with pay on account of sickness during the same year); 20 Op. Att'y Gen. 716, 718 (1894) (ruling that the correct interpretation of the law is "to charge Sundays and holidays against the absentee when they intervene during the period of absence"); 22 Op. Att'y Gen. 77, 79 (1898); *Leaves of Absence Include Sundays & Legal Holidays,* 5 Comp. Treas. 436, 436–37 (1899). The opinion of the Comptroller of the Treasury, which contains the most detailed analysis among the contemporaneous constructions of the early statutes, was based in large part on the general legal principle that "[w]here the time limited by statute for a particular purpose is such as must necessarily include one or more Sundays, they are to be included in the enumeration, unless they are expressly excluded or the intention of the legislature to exclude them is manifest." 5 Comp. Treas. at 442; *see also Computation of Leaves of Absence to Employees of Mail–Bag & Mail–Lock Repair Shops,* 13 Comp. Treas. 799, 800 (1907).

In 1899, Congress explicitly changed that rule with respect to annual leave for federal civil servants. *See* Act of Feb. 24, 1899, ch. 188, 30 Stat. 846, 890. As the Board notes, however, the 1899 statute did not apply to sick leave, and the agencies therefore continued to charge employees with sick leave for non-workdays intervening during a period of leave. That practice was not changed until 1951. Moreover, statutes that did not specify that leave periods included only "workdays" contin-

ued to be construed to include non-work-days in computing leave periods. *See To the Attorney Gen.,* Comp. Gen. B–133,674 (1957); 13 Comp. Treas. at 800; 5 Comp. Treas. at 436–37; 20 Op. Att'y Gen. at 718.

The first statute granting military leave for civilian employees of the federal government was enacted in 1917. Act of May 12, 1917, ch. 12, 40 Stat. 72. That statute granted up to 15 days of military leave each year for members of the Officers' Reserve Corps "on all days during which they shall be ordered to duty with troops or at field exercises, or for instruction." Although the statute did not state whether intervening non-workdays during a period of military leave were to be charged as leave, the statute was consistently applied in accordance with the pre–1899 system for calculating annual leave and the then-existing policy for calculating sick leave. *See To the Attorney Gen.,* Comp. Gen. No. B–133,674; *To the Sec'y of the Army,* 27 Comp. Gen. 245, 252–53 (1947). Calculating military leave in that way, moreover, was consistent with the training requirements for federal employees who were members of reserve and national guard units. Those training requirements, which had just been adopted in the previous year, featured one extended 15–day training period per year for which the employee would have to take leave from his civilian job. *See* Act of June 3, 1916, ch. 134, § 31, 39 Stat. 166, 187 (members of the regular Army Reserve subject to field training for up to 15 days per year); *id.* § 39, 39 Stat. at 191 (members of Officers' Reserve Corps subject to duty or instructional service of up to 15 days per year); *id.* § 55, 39 Stat. at 195–96 (members of Enlisted Reserve Corps subject to be ordered to instructional or training periods of up to 15 days per year); *id.* § 92, 39 Stat. at 206 (members of National Guard subject to 48 drills plus an instructional period of at least 15 days in training each year).

The same pattern—of requiring training periods of 15 days per year and granting a corresponding period of 15 days of military leave—continued unchanged in any essential respect for many years. *See* Act of Feb. 28, 1925, § 20, 43 Stat. 1080, 1085 (members of the Fleet Naval Reserve required to perform training not to exceed 15 days annually); *id.* § 36, 43 Stat. 1089–90 (members of Fleet Naval Reserve entitled to leave of absence from their federal employment for periods not to exceed 15 days in any one calendar year); Naval Reserve Act of 1938, § 9, 52 Stat. 1175, 1177; Armed Forces Reserve Act of 1952, Pub.L. No. 82–476, § 233(c), 66 Stat. 481, 490. The Comptroller General, although requested to reconsider that office's interpretation of the military leave statute on several occasions, continued to construe the statute as requiring that non-workdays within a period of military leave be counted against the 15–day military leave allotment. *See To the Sec'y of the Army,* 29 Comp. Gen. 269, 271 (1949) (finding it "significant" that a recent amendment to the military leave statute "contains no express or implied language that the theretofore method of charging military leave upon a calendar basis, which was well known to the Congress, was in anywise to be changed"); *To the Sec'y of the Army,* 27 Comp. Gen. at 252–53; *To the Sec'y of Agriculture,* 16 Comp. Gen. 1039, 1041 (1937); *To the Postmaster Gen.,* 9 Comp. Gen. 448, 448 (1930).

In 1956, the various training statutes were consolidated into a single section as part of the recodification of Titles 10 and 32 of the United States Code. *See* Act of Aug. 10, 1956, Pub.L. No 84–1028, 70A Stat. 1 (1956). The 15–day training requirements were codified at 10 U.S.C. § 672(b) (1958) and 32 U.S.C. § 502(a)(2) (1958). The 15–day period of allowable military leave was found at Pub.L. No. 84–1028, § 29(a), 70A Stat. 632 (1956), and

was codified at 5 U.S.C. § 32r(a) (1958). The latter statute, which is now 5 U.S.C. § 6323(a), read in 1956 as follows:

> Each Reserve of the armed forces or member of the national guard who is an officer or employee of the United States or the District of Columbia, permanent or temporary indefinite, without regard to classification or terminology peculiar to the Civil Service system, is entitled to leave of absence from his duties, without loss of pay, time, or efficiency rating for each day, but not more than 15 days in any calendar year, in which he is on active duty or is engaged in field or coast defense training under sections 502–505 of title 32, United States Code.

The period of military leave authorized in that statute, as in its predecessors, was construed as being 15 calendar days, not 15 workdays. In a 1957 opinion dealing with the Fleet Reserve, the Comptroller General explained:

> Not only is it apparent from the plain language of the statute that the fifteen-day period of leave relates to, and must be governed by, the fifteen-day period of training duty, but the legislative history also supports this view. . . . We think it is evident . . . that the intention of Congress was to grant, authority for the performance by Naval reservists of training duty for periods of not to exceed 15 days and, to provide, so far as government employees are concerned, that their pay, time, or efficiency rating should not be adversely affected by reason of their performing such duty. Thus, both the plain language and legislative history of the statute, viewed in the light of the preceding statutes with which it is entirely consistent and on which it was undoubtedly patterned, make it clear that the phrase "from his duties" may not be construed as an express exclusion of Sundays and holidays from the computation of leave for periods of military training ordered thereunder.

*To the Attorney Gen.,* Comp. Gen. No. B–133,674.

In 1951, as part of an overhaul of the federal leave system, Congress provided that both annual and sick leave for federal employees would be charged without counting non-workdays. *See* Pub.L. No. 82–233, §§ 203–209, 65 Stat. 672, 679–83 (1951). The new statute specifically provided that the "days of leave provided for [in the statute] shall mean days upon which an employee would otherwise work and receive pay, and shall be exclusive of holidays and all nonworkdays established by Federal statute or by Executive or administrative order." *Id.* § 205(a), 65 Stat. at 681. The 1951 statute applied only to annual and sick leave and did not apply to other forms of leave, such as military leave.

From this background, it is evident that, as of 1957, the rules applicable to military leave were clear: The 15–day period of military leave was routinely charged on the basis of calendar days, so that intervening non-workdays were counted against the 15–day period. Non-workdays at the beginning or end of the period, however, were not counted. Therefore, if an employee whose normal work week was Monday through Friday began his or her military training service on a Monday and returned to work two Mondays later, the employee would be charged for the intervening weekend days, but not the weekend days at the beginning or end of the military leave period.

That was the state of the law as of 1957, and I do not understand the court to disagree. If that is correct, then the Board's decision in this case must be upheld unless we can say that, at some point between 1957 and 1999 (the leave year at issue in this case), a change was made that re-

quired the military leave statute to be construed differently. As detailed below, no such change occurred.

## B

In 1966, the military leave statute was recodified as 5 U.S.C. § 6323(a). Pub.L. No. 89–554, 80 Stat. 378, 522 (1966). In 1968, Congress made two relevant changes in the leave statutes. First, it amended section 6323 to grant military leave of up to 22 workdays to reservists or members of the National Guard who are activated for law enforcement purposes. Second, it enacted section 6326, which granted up to three days paid leave for employees to attend the funeral of an immediate relative in the Armed Forces who died as a result of injuries incurred in a combat area. Pub.L. No. 90–588, 82 Stat. 1151 (1968).

Significantly, the 1968 legislation distinguished between the 22 "workdays" of leave that reservists would be granted, which the House Committee report and proponents of the legislation pointed out would amount to approximately 30 calendar days, and the 15 "days" of military leave ordinarily provided for training, which the Chairman of the Civil Service Commission pointed out meant 15 calendar days. *See* H.R.Rep. No. 90–1560, at 6, 10, 12 (1968). The House Committee report thus reflects a clear understanding that the 15 days of military leave provided by section 6323(a) was, and would continue to be, calculated on the basis of calendar days, not workdays.

In the course of Congress's consideration of the 1968 legislation, a question arose as to whether the amount of military leave provided under section 6323(a) was adequate. To address that issue, the Senate Committee on Post Office and Civil Service directed the Civil Service Commission to report back to the Committee as to whether there was a need to provide more paid leave to federal employees for mili-

tary training. *See* S.Rep. No. 90–1443, at 2 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4288, 4289. In its response, the Commission submitted a detailed report, in which the Commission made clear that military leave was charged on a calendar day basis and concluded that there was no need to change that practice. See Civil Service Comm'n, Bureau of Policies & Standards, *Military Leave for Reservists & National Guardsmen—June 1969, reprinted in Improve Administration of Leave System for Federal Employees: Hearings Before the Subcomm. on Employee Benefits of the House Comm. on Post Office & Civil Service,* 92d Cong. 25–36 (1972). The report stated:

> The suggestion that military leave be charged on a workday rather than a calendar day basis is, in effect, a request for additional military leave. It has been shown, in previous sections of this report, that 15 days of military leave is sufficient to meet the "normal" requirements of the Reserves or National Guard. Any increase in the amount of military leave with pay would result in increased cost to the Government....
>
> The 15 calendar days of military leave allowable adequately met the needs of the vast majority of reservists and National Guardsmen in 1968.

*Id.* at 29. No statutory change was made as a result of the Commission's report.

The court does not suggest that the 1968 amendment altered the prior regime. In fact, it acknowledges that the Board's interpretation "may have been correct for the original version of section 6323(a) enacted in 1968." However, the court concludes that an important change in the statute was made in 1980, when the language of the military leave statute was altered.

The pre–1980 version of section 6323(a) provided that a federal civilian employee

"is entitled to leave without loss of pay, time, or performance or efficiency rating for each day, not in excess of 15 days in a calendar year, in which he is one active duty or is engaged in field or coast defense training" with the Reserves or the National Guard. The 1980 amendment changed that formulation. It omitted the language "for each day, not in excess of 15 days a calendar year, in which he is on active duty or is engaged in field or coast defense training." In place of that language, the 1980 amendment inserted the words "for active duty or engaging in field or coast training," and added a new sentence stating, "Leave under this subsection accrues for an employee or individual at the rate of 15 days per fiscal year and, to the extent that it is not used in a fiscal year, accumulates for use in the succeeding fiscal years until it totals 15 days at the beginning of a fiscal year." Pub.L. No. 96–431, 94 Stat. 1850, 1850 (1980).

The court finds that through that amendment Congress "changed the computation of leave days from a variable measurement pegged to the actual length of military training, to a constant measurement of 15 days," and thereby changed the method of calculating military leave from counting calendar days to counting workdays. According to the court, "While leave computed by the actual period of reserve training necessarily includes non-workdays in the calculation, leave measured by an absolute number of days (15) does not."

I disagree that the 1980 amendment made that fundamental change in the meaning of the statute. Nothing about the language used in the 1980 formulation, under which "leave accrues ... at the rate of 15 days per fiscal year" requires that the 15 days be interpreted to as workdays rather than calendar days. The most that can be said for the new language is that it is possible to read the 1980 formulation as excluding non-workdays, while it is more difficult to read the pre–1980 language in that fashion. But that proposition falls far short of establishing that the 1980 statute must be given the interpretation that the court assigns to it.

The legislative history of the 1980 Act is highly instructive on this point. The House Report on the legislation explicitly states that the legislation was intended to make only "three changes in existing law." H.R.Rep. No. 96–1128, at 2 (1980), reprinted in 1980 U.S.C.C.A.N. 3871, 3871. It was intended (1) to make military leave available on a fiscal year basis rather than a calendar year basis; (2) to allow federal employees to carry over some or all of their military leave to the succeeding fiscal year; and (3) to grant part-time employees a proportional share of the military leave provided to full-time employees. Id. The principal problem addressed was the hardship that occurred when employees had to attend two training sessions in the same calendar year and could not carry over military leave to accommodate the scheduled sessions. There is no indication in the brief report of any intention to change the method of computing the 15 days of allowable military leave from calendar days to workdays.

The hearing that was held on the bill that became the 1980 amendment to section 6323 makes clear that the focus of the legislation was on allowing military leave to be carried over, and that no change was intended to the method of calculating military leave. See Retirement Appeals, Military Leave, & Quadrennial Pay Comm'n, Hearing Before the Subcomm. on Compensation & Employee Benefits of the Comm. on Post Office & Civil Service, House of Representatives, 96th Cong. 4–10 (1980). Moreover, the witnesses who appeared before the subcommittee made clear that they regarded as settled—and not at issue in the proposed legislation—

that the 15 days of military leave were to be used for the 15–day training period required for members of the Reserves and the National Guard. *See id.* at 9, 11, 12. As in the House report, there was no suggestion at the hearing that any change in the method of calculation was intended. It thus seems clear that the change in the language of section 6323(a) was made solely to provide additional flexibility for employees whose units might schedule two 15–day training sessions in a single calendar year and who might have to carry over military leave from one year to another. The contrary construction is by no means required by the language of the 1980 Act, and in light of the complete absence of any indication of an intention to change the longstanding method of calculating military leave, the 1980 Act cannot fairly be interpreted as effecting that change.

In the aftermath of the 1980 amendment to section 6323, the Comptroller General on several occasions revisited the issue of how to calculate military leave, and consistently ruled that the "calendar day" system that was in place before 1980 was still in effect after the 1980 revision. *See In re Military Leave—Active Duty Spans Two or More Fiscal Years,* 71 Comp. Gen. 513, 515 (1992); *In re Haas,* Comp. Gen. B–212,851 (1984); *In re McMillian,* Comp. Gen. B–211,249 (1983); *In re AFGE Local 1364,* 61 Comp. Gen. 558, 559 (1982); *In re Campbell,* 60 Comp. Gen. 381, 384 (1981).

Section 6323(a) was amended in minor respects after 1980, but none of those amendments has any arguable effect on this case. Accordingly, if as I believe is clear, the 1980 statute did not alter the method of calculating military leave, we must adhere to the pre–1980 system of calculation, which the court recognizes "necessarily includes non-workdays in the calculation."

## C

The court focuses on another piece of evidence that it regards as instructive with regard to the question before us: the administrative construction of 5 U.S.C. § 6326, a statute that provides federal employees up to three days of leave to attend funerals or memorial services for close relatives who are members of Armed Forces and who die from injuries incurred in a combat zone. Section 6326 does not specify whether the three days are to be counted as workdays or calendar days, but the Civil Service Commission and the Office of Personnel Management have consistently interpreted the term "day" in the statute to mean "workday." 5 C.F.R. § 630.804. The court notes the apparent inconsistency in the agency's position with respect to the calculation of military leave and funeral leave.

It is true that OPM's funeral leave regulation defines the word "day" in section 6326 to mean "workday," not "calendar day," and that neither OPM in its regulations nor the government on appeal has provided any explanation for why OPM construed the term "day" differently for purposes of sections 6323 and 6326. While the reason for this apparent inconsistency is unexplained,[1] nothing in the principles underlying the *Chevron* doctrine authorizes a court to use an agency's regulatory construction of one statute (here, section 6326) to trump its consistent, longstanding

1. It may be that the reason for the difference lies in the shortness of the three-day period in the funeral leave statute. In early administrative constructions of the federal leave statutes, the Attorney General noted that statutory time periods are usually computed by including Sundays and holidays unless the periods are very short. 22 Op. Att'y Gen. at 79, 20 Op. Att'y Gen. at 718. The same principle applies to computations of time under the Federal Rules of Civil and Criminal Procedure. *See* Fed.R.Civ.P. 6(a); Fed.R.Crim.P. 45(a).

construction of a different statute (here, section 6323). Even if the agency's construction of section 6326 is at odds with the rationale underlying its construction of section 6323, there is no justification for giving the agency's construction of section 6326 greater respect in construing section 6323 than the agency's construction of section 6323 itself.

The court also regards as an inconsistency the fact that the government's position with respect to the calculation of military leave is that employees are charged for non-workdays occurring within the period of military leave, but not for non-workdays occurring at the beginning or end of the period of military leave. Thus, if an employee who works a normal Monday through Friday schedule begins a 15-day military training period on a Sunday and concludes that training period two Sundays later, the employee is charged for the intervening weekend, but not for the Sunday at the outset of the training period nor for the Sunday at the end of that period.

In fact, there is no inconsistency in the traditional practice of not charging military leave for non-workdays at the outset and the end of a period of military training. As noted earlier, that practice has been used since the outset of the military leave system, and merely reflects the view that (1) the period of the employee's absence from work does not begin until a day that the employee is required to be at work, and (2) an employee is not regarded as having been absent during a non-workday if the employee returns to work on the first workday following a non-workday. *See In re McMillian,* Comp. Gen. B–211,-249; *In re AFGE Local 1364,* 61 Comp. Gen. at 559; *In re Campbell,* 60 Comp. Gen. at 384; *To the Attorney Gen.,* Comp. Gen. B–133,674; *To the Sec'y of the Army,* 27 Comp. Gen. at 252–53. While that approach reflects a relatively generous con-

struction of the military leave statute, it is not an unreasonable application of the traditional "calendar day" standard.

## D

The court disposes of the longstanding administrative interpretation of the military leave statute by noting that OPM lacks formal rulemaking authority with respect to that statute and that the administrative interpretation of the statute is therefore not entitled to the level of respect that would be due to an interpretation embodied in formal regulations. While OPM's position would be virtually impregnable if it had issued a formal regulation pursuant to statutory authority adopting the traditional method of calculating military leave, the absence of a formal regulation does not mean that the longstanding administrative construction of the military leave statute has no more force than the "interpretations contained in policy statements, agency manuals, and enforcement guidelines" that have been held to be "beyond the *Chevron* pale." *United States v. Mead Corp.,* 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). As noted, the Comptroller General, in a series of detailed opinions issued over many years, has consistently interpreted the military leave statute in the manner urged by the government in this case. In addition, the Civil Service Commission took the same position when asked by Congress for its views and, until the recent statutory amendment to section 6323 in 2001, OPM had consistently interpreted the military leave statute throughout the lifetime of the statute as requiring computations that included non-workdays occurring within the leave period. The administrative interpretation of the statute therefore constitutes much more than the kind of informal statement of agency policy that was at issue in *James v. Von Zemenszky,* 301 F.3d 1364 (Fed.Cir.2002),

and is entitled to be given considerable weight. *See Barnhart v. Walton,* 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *see also Mead,* 533 U.S. at 234–35, 121 S.Ct. 2164; *Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995). Moreover, it is significant that throughout the 84–year period between 1917 and 2001, Congress took no action to alter the "calendar day" basis for calculating military leave, even though that method was consistently used throughout the government, even though the use of that method was called to Congress's attention on several occasions, and even though Congress frequently amended the military leave statute to correct other perceived flaws in the Act. *See Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

In sum, when Congress enacted the military leave statute it was clear that leave was to be calculated by counting intervening non-workdays within the leave period. During the ensuing 84 years, Congress did not change that rule, and the various administrative agencies that had occasion to address the statute consistently interpreted it in that fashion. While that method of leave computation may seem anachronistic to us in light of changes in the method of calculating other leave periods, it was the method Congress chose for military leave, and it was the method that was in effect at the time of the events in this case.

I would affirm the Board's decision.