Thomas A. WATSON, Petitioner,

v.

DEPARTMENT OF JUSTICE, Respondent.

No. 94–3440.

United States Court of Appeals, Federal Circuit.

Aug. 29, 1995.

Michael J. Schrier, Staff Counsel, American Federation of Government Employees, AFL–CIO, Washington, DC, argued for petitioner. With him on the brief were Mark D. Roth, General Counsel and Charles A. Hobbie, Deputy General Counsel.

Patricia L. Petty, Attorney, Commercial Litigation Branch, Department of Justice, Washington, DC, argued for respondent. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director and Anthony H. Anikeeff, Assistant Director.

Before NEWMAN, MAYER and BRYSON, Circuit Judges.

MAYER, Circuit Judge.

Thomas A. Watson seeks review of an initial decision of the Merit Systems Protection Board, in which an administrative judge upheld the decision of the Department of Justice to remove him from his position as a border patrol agent in Nogales, Arizona. No. DE0752930374–I–1 (Nov. 18, 1993). This decision became final on May 20, 1994, when the board denied Watson's petition for review. Because we agree that the agency met its burden of proof, we affirm.

*Background*

The facts are not in dispute. Watson was a border patrol agent at the United States Border Patrol facility in Nogales, Arizona, for five years. He was regarded as an exemplary employee before the events discussed below, and had received various awards, including the Attorney General's Award for Exceptional Heroism.

On June 12, 1992, Watson was on duty patrolling for drug smugglers with four other border patrol agents. After the agents spotted "scouts" [1] in the area, Watson and another agent, Michael Elmer, began to take turns waving each other forward. At some point, they lost contact with each other, and another agent notified Watson by radio that one of the scouts had turned back toward the border. Watson saw a scout and fired a warning shot into the air, but instead of retreating the scout ran toward him until Watson fired a series of shots over the scout's head. After telling Elmer by radio that the scouts were heading in his direction, Watson heard a series of shots. He ran after the scout he had encountered earlier, who outran him, and a few minutes later he met up with Elmer.

Elmer told Watson that he had shot a scout, and led Watson to the body. Along the way, Elmer shot at and missed the scout Watson had encountered earlier. When they found the body, Watson searched for a weapon but found none. He suggested to Elmer

that the shooting should be reported as accidental, but Elmer replied that he did not want to report the shooting, and that he would bury the body later. He then pointed his rifle at Watson and asked if he had any problem with that. While Watson continued to look for a weapon, Elmer began to drag the body away. Elmer later asked Watson for help carrying the body across the border, but Watson refused. On the way back to the other agents, Elmer again directed his weapon toward Watson and reiterated that he did not intend to report the shooting and that he did not expect Watson to tell anyone either.

Watson went off duty at 10:00 p.m. At approximately 10:30 a.m. on June 13, 1992, he told Acting Patrol Agent-in-Charge José Marrufo that Elmer had shot and killed Dario Valenzuela, an unarmed Mexican national, while they were on duty the previous evening; Watson also disclosed his own misconduct, which included lending Elmer the unauthorized semi-automatic rifle used to shoot Valenzuela.

Following his disclosure of these events, Watson was placed on administrative leave with pay. Elmer was tried for Valenzuela's murder. During the trial, Watson testified against Elmer and about his own misconduct. The Border Patrol received extensive negative publicity during the trial, but in December 1992, Elmer was acquitted of all charges.

The agency proposed Watson's removal on April 12, 1993, and he was removed effective May 14, 1993, for "noncompliance with standards, policies, regulations or instructions issued by the service." Specifically, he was charged with (1) delaying 15 hours before reporting the shooting, in violation of Administrative Manual (AM) § 4210(8)(A)(4) ("Any employee who discharges a firearm, or is involved in or observes a reportable shooting incident, shall verbally notify the first-line supervisor as soon as time and circumstances permit, but before the officer goes off duty."); (2) failure to obtain medical aid for Valenzuela, in violation of Western Region Policy ("When an injured alien is encoun-

---

1. The term "scout" refers to an individual "who trie[s] to ensure safe passage by preceding the main group of smugglers." Slip Op. at 6.

tered, the extent of his injuries will determine the immediate action to be taken. It is of utmost importance that such person receives proper attention.") and the General Counsel's determination that "as law enforcement officers, Border Patrol officers have a moral obligation to aid the injured."; (3) failure to timely report Elmer's use of an unauthorized weapon, in violation of Operations Instructions (OI) § 287.10(g)(1) ("All employees are responsible for reporting immediately when learned allegations of misconduct by other employees. . . ."); (4) firing warning shots June 12 and on other occasions, in violation of AM § 4210(5)(A) ("[T]he firing of warning shots is prohibited."); (5) failure to report that Elmer had fired shots on March 18, 1992, in violation of AM § 4210(8)(A)(4); and (6) failure to timely report that, in April 1992, Elmer had bragged about killing a narcotics trafficker, in violation of OI § 287.10(g)(1).

On May 20, 1993, Watson appealed his removal to the board, claiming that the agency's choice of penalty was in retaliation for his whistleblowing disclosures on June 13 and at Elmer's trial. In the initial decision, an administrative judge (AJ) sustained five of the six charges[2] and denied him corrective action. The AJ held that the agency proved the facts of the sustained charges by a preponderance of the evidence, and that the penalty of removal was within the tolerable limits of reasonableness. The AJ also held that Watson made whistleblowing disclosures under the Whistleblower Protection Act of 1989 (WPA), 5 U.S.C. § 2302(b)(8), that contributed to his removal.[3] *See* Slip Op. at 21. Thus, the burden shifted to the agency to prove that it would have taken the same action in the absence of his protected disclosures, *see* 5 U.S.C. § 1221(e)(2) (1994), and the AJ concluded that the agency satisfied this burden.

### Discussion

Under the WPA, employees with the authority to take personnel actions are forbidden to do so as a result of any disclosure of information by an employee that the employee reasonably believes evidences (i) a violation of law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. *See* 5 U.S.C. § 2302(b)(8). The board must order corrective action if an employee proves that a disclosure under section 2302(b)(8) contributed to an adverse personnel action, unless the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of the disclosure. *See id.* § 1221(e)(1), (2). It is undisputed on appeal that the agency proved the facts of the sustained charges, and that it proved that its choice of penalty

---

**2.** The AJ sustained all of the charges except failure to obtain medical aid for Valenzuela.

**3.** Although the board found that Watson made protected disclosures that contributed to his removal, its decision did not explicitly distinguish the protected from the unprotected ones. It referred to Watson's statement that Elmer killed Valenzuela as "[p]aramount," Slip Op. at 21, and held that his disclosures "were protected disclosures, under 5 U.S.C. § 2302(b)(8), because they were based on his reasonably-held belief that Elmer violated Arizona and federal law." *Id.* at 22 (emphasis added). These passages, along with its conclusion that the agency satisfied its burden of proof, imply that the board did not consider Watson's disclosures of his own misconduct to be protected. Thus, we refer to protected disclosures in this opinion only when referring to Watson's disclosures of others' wrongdoing. This approach finds support in our cases and elsewhere. *See, e.g., Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286, 97

S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (an employee "ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision . . . on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision"); *Marano v. Department of Justice,* 2 F.3d 1137, 1142 n. 5 (Fed.Cir.1993) ("In this case, we are not faced with a situation in which an employee in essence blew the whistle on his own misconduct in an effort to acquire the WPA's protection. *Even so, we doubt that the WPA would protect such an individual from an agency's remedial actions.*" (emphasis added)); *see also* 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20) ("[The WPA] will not shield employees who engage in wrongful conduct merely because they have at some point 'blown the whistle'. . . . In such cases, the agency will, of course, be provided with an opportunity to demonstrate that the employee's whistleblowing was not a contributing factor in the personnel action.").

was within the tolerable limits of reasonableness. It is similarly undisputed that Watson proved his affirmative defense of retaliation based on whistleblowing disclosures. Thus, the only issue before us is whether the board's decision that the agency met its burden of proving by clear and convincing evidence that it would have removed Watson even in the absence of his protected disclosures is correct. *See Marano v. Department of Justice*, 2 F.3d 1137, 1141 (Fed.Cir.1993). The board concluded that the agency met its burden of proof because it demonstrated that it "would have taken the removal action if it had been alerted to the appellant's misconduct by other means." Slip Op. at 22. Watson argues this was error. This court may reverse a decision of the board only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule, or regulation having been followed; or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (1994). Statutory interpretation is a question of law reviewed *de novo* on appeal. *Marano*, 2 F.3d at 1141.

### A.

Watson's central argument is that, when facts supporting discipline are intertwined with facts disclosed by the whistleblower, the agency must prove by clear and convincing evidence not only that it would have taken the same personnel action in the absence of the protected disclosures, but also that it would have eventually discovered the content of the disclosures from another source. We decline to establish such an "inevitable discovery" rule; nor do we read the sources cited by Watson—the statute, *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), or this court's opinion in *Marano*—to establish such a rule.

■ The statute requires only that the agency demonstrate by clear and convincing

evidence that it would take the same personnel action in the absence of the protected disclosure, *see* 5 U.S.C. § 1221(e)(2); it does not require, as Watson argues, that the adverse personnel action be based on facts "completely separate and distinct from protected whistleblowing disclosures." Watson reads the phrase "in the absence of the protected disclosure" to mean that the content of his disclosure could have nothing to do with his removal, because absent his disclosure the agency would not have known of the events in question. Not only is there no such requirement in the statute, but we also cannot assume that the agency would never have found out about the events of June 12 simply because no one had come forward as of the morning of June 13. Several parties knew of the events: Elmer, Watson's wife Lori Watson, at least three other border patrol agents, and the Mexican citizens who later filed a civil rights complaint against all of the agents on duty that evening.

Watson also argues that the *Mt. Healthy* test, which was codified in the WPA,[4] supports his "inevitable discovery" rule in cases in which employers base their personnel decisions on a mixture of permissible and impermissible factors. In *Mt. Healthy*, a school board refused to renew the contract of Doyle, a public school teacher, after he made a telephone call to a local radio station criticizing the school's new dress code for teachers. Doyle claimed that the school board violated the First and Fourteenth Amendments by removing him, in part, because of the radio incident. In reaching its decision, the board had cited not only the radio incident, but also Doyle's use of obscene gestures to correct students on one occasion, as evidence of "a notable lack of tact" on his part that left doubt "as to [his] sincerity in establishing good school relationships." *Id.* at 282, 97 S.Ct. at 573 (quoting the board's written statement to Doyle). The district court concluded that, because the First Amendment-protected radio incident played

---

4. "With respect to the agency's affirmative defense, it is our intention to codify the test set out by the Supreme Court in the case of *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The only change made by this bill as to that defense is

to increase the level of proof which an agency must offer from 'preponderance of the evidence' to 'clear and convincing evidence.'" 135 Cong. Rec. 4513 (1989) (Joint Explanatory Statement on S. 508).

"a 'substantial part'" in the school board's decision, Doyle was entitled to be reinstated with back pay. *Id.* at 283, 97 S.Ct. at 574 (quoting the district court). The Court of Appeals affirmed. The Supreme Court, however, disagreed with the view that "[i]f a nonpermissible reason ... played a substantial part in the decision not to renew—even in the face of other permissible grounds—the decision may not stand." *Id.* at 284, 97 S.Ct. at 574 (quoting the district court). The Court concluded that if the board would have reached the same decision "had not the constitutionally protected incident ... occurred," the fact that the incident played a substantial part in the decision "would not necessarily amount to a constitutional violation justifying remedial action." *Id.* at 285, 97 S.Ct. at 575. The Court reasoned that "[a] rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Id.* The district court's rule would thus "require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred." *Id.* The Court vacated and remanded to give the school board the opportunity to show that "it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct." *Id.* at 287, 97 S.Ct. at 576.

Watson reads this case to stand for the proposition that the school board would meet its burden of proof only if a basis separate and distinct from Doyle's protected First Amendment disclosures justified taking action against him. We disagree. In reaching its decision that Doyle's radio call was protected by the First and Fourteenth Amendments, the Court observed that there was "no suggestion by the Board that Doyle violated any established policy, or that its reaction to his communication to the radio station was anything more than an ad hoc response to Doyle's action in making the memorandum public." This circumstance stands in marked contrast to Watson's case, in which his conduct did violate agency regulations. The Court also noted that the "question of whether speech of a government employee is constitutionally protected expression necessarily entails striking 'a balance between the interests of the [employee], as a citizen, ... and the interest of the State as an employer, in promoting the efficiency of the public services it performs....'" *Id.* at 284, 97 S.Ct. at 574 (quoting *Pickering v. Board of Ed.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)). Thus, contrary to Watson's argument that the speech was under no circumstances to play a role in the personnel decision, the Court very clearly showed circumstances under which it would be entirely appropriate for a government employer to consider such speech.

Finally, Watson argues that *Marano v. Justice,* 2 F.3d 1137 (Fed.Cir.1993), requires the two-part analysis he suggests. In that case, Marano, an agent in the Albany office of the Drug Enforcement Administration (DEA), was reassigned to the New York City office after he and five other agents disclosed misconduct and mismanagement by the supervisory agents in Albany. Because of the deficiencies of the Albany supervisors, Marano had assumed the role of *de facto* manager; in an effort to correct the situation at that office, therefore, Marano was transferred, as were the supervisors. *See id.* at 1139. Marano argued that his transfer was improper because it was a result of his protected whistleblowing disclosures. The board concluded that, although Marano's memorandum was a protected disclosure, he did not prove that this disclosure was a factor contributing to the personnel action. The board credited the agency's testimony that the transfer was necessary to correct the situation disclosed by Marano; it was not a result of the disclosures themselves. *See id.* This court reversed and remanded, holding that the board erred "in deciding that only the fact of disclosure, or in other words, the whistleblower's status as a whistleblower, could be a contributing factor under the statute." *Id.* at 1143.

Watson wants to derive his additional proof requirement from the court's statement that the agency, on remand, would be asked

"to demonstrate that the same personnel action would have been taken had the agency not learned of the situation in the Albany office from Marano." *Id.* We do not read this statement as implying that the agency must also prove as a factual matter that it would have been able to discover the situation from someone other than Marano. Such a requirement would alter the statutorily set burden of proof, under which the agency must demonstrate that it would have taken the same personnel action in the absence of the protected disclosure.

### B.

▮▮▮ Watson also argues that the board's interpretation of the WPA punishes employees for making disclosures rather than encouraging them to do so. Watson is correct that law enforcement officers, who have an overriding duty to report violations of law in a timely fashion, are in a unique position when faced with the decision whether to blow the whistle on wrongdoing. On the one hand, the WPA was clearly intended to encourage such disclosures and to prevent reprisals against the whistleblowing employee. *See* Whistleblower Protection Act of 1989, Pub.L. No. 101–12, § 2, 103 Stat. 16 (1989) (5 U.S.C.A. § 1201 note (West Supp. 1995)) (Congress enacted the WPA to "strengthen and improve protections for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the government. . . ."). On the other hand, a federal law enforcement officer who does not make a disclosure in a timely fashion risks punishment for untimely disclosure if he does disclose the illegality. Nevertheless, we do not accept Watson's argument that untimely disclosure should never be used as a basis for disciplinary proceedings. That approach would be for Congress. Moreover, law enforcement agencies have an obvious interest in ensuring that incidents such as this will be timely reported. Thus, although we agree with Watson that the law enforcement officer faced with a choice between untimely disclosure or no disclosure is in an uncomfortable position, at the same time, the duty to disclose wrongdoing within certain time limits makes it in the officer's interest to report violations of law. The fact that a protected disclosure may be made as

part of an employee's duties, but that an employee may nevertheless be disciplined for violating agency policy if his disclosure is untimely, strikes a balance between the intent of the WPA and the agency's interest in prompt disclosure of wrongdoing. *See Marano,* 2 F.3d at 1142; *see also* 140 Cong.Rec. H11419, H11421 (daily ed. Oct. 7, 1994) ("*A protected disclosure may be made as part of an employee's job duties. . . .*"). Watson argues that the board's approach discourages federal law enforcement agents from disclosing wrongdoing. To the contrary, the approach balances the expansive protections of the WPA with the agency's legitimate interests as set forth in its regulations, and should encourage agents to disclose wrongdoing in a *timely* manner. Moreover, Watson's assumption that there would have been no adverse consequences to him if he had not disclosed Elmer's wrongdoing is contradicted by deciding official Ronald J. Dowdy's testimony that he would have considered criminal charges against Watson had he discovered that Watson had not disclosed these events. Law enforcement officers are held to a higher standard of conduct than are other federal employees; the board in this case merely recognizes that fact.

### C.

Finally, Watson argues that the board did not make sufficient factual findings to support its conclusion that the agency met its burden of proof. He reiterates his argument that the "clear and convincing" standard requires a legitimate ground for the personnel action completely independent of the employee's protected disclosure; we rejected this argument above. He also argues, however, that the board did not specifically consider the strength of the agency's evidence that his performance was unacceptable; the strength of any retaliatory motive on the part of the agency officials who participated in the decision to remove him; whether similar actions have been taken against others who engaged in similar conduct; Watson's excellent work record; and other factors.

▮▮▮ We do not agree that the board's findings were insufficient to support its decision. Watson admitted most of the charged misconduct. The board found that he failed to report Elmer's misconduct prior to going

off duty, a violation of agency regulations. Moreover, Watson took "positive steps" to avoid discovery of his own misconduct when he turned in his fully loaded personal ammunition magazines instead of the agency-issued magazines from which he had fired warning shots that evening. The AJ found credible the testimony of Dowdy and Robert S. Coffin, the officials who proposed and authorized Watson's removal, that they removed him because of a history of knowing failure to report his and others' misconduct in a timely manner and not because of the whistleblowing. Contrary to Watson's argument, this testimony was properly considered. *See Clark v. Department of Army,* 997 F.2d 1466, 1473 (Fed.Cir.1993). In fact, the types of proof examined by the board, including testimony of witnesses who participated in the agency decision, correspond to those listed in the legislative history as appropriate to consider. *See* 135 Cong.Rec. 5033 (1989) (Explanatory Statement on S. 20). Here, the AJ found that these factors favored the agency. For example, although agency witnesses said that they had not removed anyone on these precise charges in the past, they did testify that at least one agent had been removed both for violating AM § 4210 and lying to an investigator. Finally, although no other border patrol agent who was on patrol with Watson and Elmer that evening had been disciplined at the time Watson was removed, agency witnesses testified that they were asked to postpone such action until a later date. We believe the board properly based its decision on the testimony of agency officials, making credibility determinations that are "virtually unreviewable" here. *Hambsch v. Department of Treasury,* 796 F.2d 430, 436 (Fed.Cir.1986). The agency proved what it was required to prove: that it would have taken the same action even if the protected disclosures of Elmer's misconduct were disregarded.

### Conclusion

Accordingly, the decision of the Merit Systems Protection Board is affirmed.

*AFFIRMED.*