**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1713**

WILLIAM SMITH,

      Petitioner,

    v.

DEPARTMENT OF LABOR; THOMAS E. PEREZ, Secretary,

      Respondents,

    and

DUKE ENERGY CAROLINAS, LLC; ATLANTIC GROUP, INC., d/b/a DZ Atlantic,

      Respondents – Intervenors.

------------------------------------

METROPOLITAN WASHINGTON EMPLOYMENT LAWYERS ASSOCIATION and GOVERNMENT ACCOUNTABILITY PROJECT,

      Amici Supporting Petitioner,

NUCLEAR ENERGY INSTITUTE, INC.,

      Amicus Supporting Respondents/Respondents-Intervenors.

On Petition for Review of an Order of the United States Department of Labor, Administrative Review Board. (14-027; 2009-ERA-007)

Argued: October 26, 2016        Decided: January 9, 2017

Before KING, KEENAN, and DIAZ, Circuit Judges.

_____

Petition for review denied by unpublished opinion. Judge Keenan wrote the opinion, in which Judge King and Judge Diaz joined.

_____

**ARGUED:** Jason Mark Zuckerman, ZUCKERMAN LAW, Washington, D.C., for Petitioner. Ann Capps Webb, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents. Kiran H. Mehta, TROUTMAN SANDERS LLP, Charlotte, North Carolina, for Intervenor. **ON BRIEF:** R. Scott Oswald, Adam Augustine Carter, THE EMPLOYMENT LAW GROUP, P.C., for Petitioner. M. Patricia Smith, Solicitor of Labor, Jennifer S. Brand, Associate Solicitor, Fair Labor Standards Division, William C. Lesser, Deputy Associate Solicitor, Rachel Goldberg, Acting Counsel for Whistleblower Programs, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents. Molly McIntosh Jagannathan, TROUTMAN SANDERS LLP, Charlotte, North Carolina, for Intervenor Duke Energy Carolinas, LLC; Lewis M. Csedrik, Jane T. Accomando, MORGAN, LEWIS & BOCKIUS, LLP, Washington, D.C., for Intervenor Atlantic Group, Inc. Ellen C. Ginsberg, Jonathan M. Rund, NUCLEAR ENERGY INSTITUTE, INC.; Donn C. Meindertsma, CONNER & WINTERS, LLP, Washington, D.C., for Amicus Nuclear Energy Institute, Inc. Richard R. Renner, KALIJARVI, CHUZI, NEWMAN & FITCH, P.C., Washington, D.C.; Tom Devine, GOVERNMENT ACCOUNTABILITY PROJECT, Washington, D.C.; Erik D. Snyder, LAW OFFICES OF ERIK D. SNYDER, Washington, D.C.; Alan R. Kabat, BERNABEI & WACHTEL, PLLC, Washington, D.C., for Amici Metropolitan Washington Employment Lawyers Association and Government Accountability Project.

_____

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal from a final decision of the Department of Labor (Department), we consider whether the Department acted arbitrarily or capriciously in dismissing a whistleblower complaint filed under the Energy Reorganization Act of 1974 (ERA), 42 U.S.C. § 5851. Petitioner William Smith filed an administrative complaint with the Department alleging that his direct employer, Atlantic Group, Inc., d/b/a DZ Atlantic (DZ Atlantic), and the operator of the nuclear facility at which he worked, Duke Energy Carolinas, LLC (Duke), unlawfully terminated his employment in retaliation for reporting a safety violation at the nuclear facility.

An administrative law judge (ALJ) concluded that although Smith established that his protected activity was a contributing factor in his termination, Duke and DZ Atlantic proved their affirmative defense that they would have taken the same adverse personnel actions even if Smith had not engaged in protected whistleblowing conduct. The Department's Administrative Review Board (the Board) affirmed the ALJ's decision.

Upon our review, we conclude that the Department's adjudication of Smith's administrative complaint satisfied the correct legal standard, and that the Department's factual findings are supported by substantial evidence. We therefore

3

deny Smith's petition for review of the Department's final decision.

I.

A.

Duke operates the Catawba Nuclear Station (Catawba), a facility in South Carolina that generates nuclear power. As required by Duke's operating license and the safety regulations promulgated by the United States Nuclear Regulatory Commission (the Commission), Duke has established a fire protection program known as "NSD-316" (the program). 10 C.F.R. § 50.48. The program requires that hourly inspections, known as "fire watches," be conducted in certain areas of the Catawba plant to ensure detection of early stages of fire, such as evidence of smoke or smoldering. The personnel who perform these "fire watches" are known in the industry as "fire watchers."

After each fire watch inspection, the fire watchers are required to record in a written log the time they completed each inspection, and to certify with their initials that the information entered is accurate. In four areas of the Catawba facility, fire watch inspections were required on an hourly basis. After each of these hourly inspections, the fire watcher

4

conducting the "rounds" signed four separate log entries that corresponded with the four different inspection areas.[1]

Petitioner William Smith was employed as a fire watcher at Catawba, from May 2007 until his employment was terminated in February 2008. Smith was employed directly by DZ Atlantic, which had entered into a contract with Duke to provide fire watchers to Catawba. These fire watchers were assigned to work under the supervision of Duke employees.

Smith and co-worker Cathy Reid generally worked the night fire watch shift, while co-workers Christine Borders and Jeff Pence generally worked the opposite day shift. Throughout Smith's employment with DZ Atlantic, these four fire watchers at Catawba occasionally "pre-signed" the fire watch logs before performing their inspections.

In January 2008, Duke supervisor David Hord informed the four fire watchers that the Commission had discovered problems at another nuclear facility involving false entries made in that facility's fire watch logs. Hord informed the Catawba fire watchers that he expected them to "follow procedures correctly."

About one month later, on February 12, 2008, Smith arrived at the job site at 3:45 p.m. He observed that Borders had "pre-

_____

[1] Around February 2008, management added a fifth fire watch area, to be inspected hourly by the fire watchers, and a corresponding fifth fire watch log sheet.

5

signed" the fire watch logs for the 3:50 p.m. round, and already had departed the facility. At some time after 3:50 p.m., when Smith asked Pence about the apparent discrepancy, Pence explained that he had performed the 3:50 p.m. fire watch. Smith replied that Pence needed to correct the log sheets to reflect that Pence had performed the 3:50 p.m. round, or Smith would report the inaccurate entries. Although Pence agreed to correct the log entries, he failed to do so. Thus, when Smith's shift began at 5:00 p.m., the fire watch logs inaccurately reflected that Borders had performed the fire watch round at 3:50 p.m.

Smith worked his shift that night from 5:00 p.m. until 5:00 a.m. During his shift, Smith signed his name directly below the inaccurate fire watch entries, but did not mention them again to Pence or report the discrepancies to any supervisor.

The next day, February 13, 2008, near the beginning of Smith's shift, Duke supervisor Tommy Withers asked Smith some questions regarding Borders' attendance at work on February 13, 2008.[2] Smith later told Pence about Withers' inquiry. Several days later, Borders stated to Reid that she was angry at Smith for informing a supervisor about the "falsification of time sheets." In that same conversation, Borders also said that she

_____

[2] The record does not indicate how Smith responded to Withers' question.

6

intended to retaliate against Smith by accusing him of sexual harassment.

Borders filed a sexual harassment complaint against Smith five days after Smith had observed the inaccurate entries in the fire watch log. Management personnel from DZ Atlantic began an investigation of Borders' complaint, and interviewed Smith about the sexual harassment allegations. During the interview, Smith denied that he had engaged in any sexual harassment, and stated that he thought that Borders had filed a false complaint against him because he was aware that she had been submitting false time sheets. The DZ Atlantic investigators ultimately concluded that there was insufficient evidence to prove or disprove Borders' sexual harassment allegations.[3]

After the investigational interview, Smith reported the fire watch log discrepancies to Hord, his Duke supervisor. Smith related to Hord that Borders had entered inaccurate information in the fire watch logs for February 12, 2008, by falsely signing that she had performed a particular inspection round. Hord was the first Duke employee to learn that the fire watch logs may have been falsified.

---

[3] Smith alleges that during the investigational interview, he reported Borders' falsification of fire watch log entries. However, the management personnel from DZ Atlantic testified that they understood Smith's comments as relating only to falsified time sheets.

Hord reported this information to his supervisor, Danny O'Brien. O'Brien advised DZ Atlantic personnel that Duke had begun investigating whether a DZ Atlantic employee had recorded inaccurate information in the fire watch logs, and that all four DZ Atlantic fire watchers had been relieved from duty during the pendency of the investigation. A comparison of Catawba's electronic access records with the fire watch logs revealed that Borders had left the Catawba facility on February 12, 2008, about an hour before the 3:50 p.m. inspection for which she had signed.

Following this investigation, Duke released the four fire watchers from their duties at the Catawba facility. Duke released Borders for failing to conduct the fire watches in accord with her certification, Pence for failing to correct the fire watch logs, and Smith for withholding his discovery of the log inaccuracies. Reid, who was not implicated in any wrongdoing, ultimately was released "favorably" from fire watch duties at Catawba.

After Duke's release of the four fire watchers, DZ Atlantic supervisor Michael Henline interviewed each individually to determine whether to terminate their employment with DZ Atlantic. Henline terminated Borders' and Pence's employment after their respective interviews. Henline later confirmed that

8

Reid was not aware of any log falsifications, and reassigned her to a job at another Duke facility.

During Smith's interview, Henline was accompanied by Duke managers O'Brien and Susan Kelley. Kelley asked Smith why he had not immediately reported the false entries made in the fire watch logs. Smith responded both that he had not thought of reporting the issue at the time, and that he had intended to report the issue before the end of the month. At the conclusion of Smith's interview, Henline terminated Smith's employment due to his delay in reporting the false log entries. Henline characterized Smith's delay in reporting the incident as a matter demonstrating a lack of integrity and trustworthiness.

As a result of the personnel action terminating his employment, Smith was ineligible for rehire by DZ Atlantic. Duke also entered into the Personnel Access Data System (PADS), an industry-wide database serving the nuclear power industry, information that Borders, Pence, and Smith no longer were suitable for unescorted access to nuclear facilities. As a result of this adverse database entry, Smith has been unable to obtain employment in the nuclear power industry.

B.

Smith filed a complaint with the Department against Duke and DZ Atlantic (the employers), under employee protection provisions of the Energy Reorganization Act of 1974 (ERA), 42

9

U.S.C. § 5851. Smith alleged that the employers took adverse employment actions against him by terminating his employment and by placing an unfavorable entry in PADS, in retaliation for Smith's protected activity of reporting Borders' false entries in the fire watch log. After conducting a hearing on the matter, the ALJ denied Smith's complaint on the basis that his protected activity was not a contributing factor in the adverse employment actions taken by the employers.

After considering Smith's appeal, the Board held that the ALJ erred in concluding that Smith's protected conduct did not contribute to his termination because "the only reason that managers learned about the [fire watch log falsification] was because Smith notified them." Accordingly, the Board held that Smith's protected disclosures were "'inextricably intertwined' with the investigation that led to his termination," and, thus, that Smith had met his burden of proving that his protected conduct was a contributing factor in his firing. The Board accordingly remanded the case to the ALJ to determine whether the employers could prove by clear and convincing evidence that they would have taken the same adverse employment actions absent Smith's protected activity.

On remand, the ALJ determined that the employers had met their burden of presenting "clear and convincing" evidence that they would have taken the same adverse employment action against

10

Smith absent the protected conduct. Applying the factors listed in Carr v. Social Security Administration, 185 F.3d 1318, 1323 (Fed. Cir. 1999), the ALJ determined that the evidence strongly supported the employers' conclusions that Smith was not trustworthy or reliable, based on his seven-day delay in reporting Borders' false log entries. The ALJ also concluded that the record lacked any probative evidence showing that either of the employers acted with a retaliatory motive. Finally, the ALJ determined that while Duke had not encountered similar integrity concerns involving its employees, the testimony of DZ Atlantic supervisor Henline showed that his company had fired employees who had manifested such integrity problems.

The Board affirmed the ALJ's second decision. The Board held that although an intervening Board decision, Speegle v. Stone & Webster Construction, Inc., ARB No. 13-074, ALJ No. 2005-ERA-006, 2014 WL 1758321 (ARB Apr. 25, 2014), governed the Board's consideration of Smith's appeal, "the analysis set out in Speegle is not unlike that set out in Carr." Accordingly, the Board held that "the ALJ's ruling . . . is correct even applying the Speegle analysis." The Board reasoned that "[p]rotected activity will not shield an under-performing worker from discipline," and that the ALJ reasonably concluded that Smith was terminated for integrity issues rather than for

11

whistleblowing activity.[4]  Smith later filed the present petition for review in this Court.

## II.

The Administrative Procedure Act (APA), 5 U.S.C. § 706, provides the statutory standard under which we review the Department's decision.  See 42 U.S.C. § 5851(c)(1).  Under this standard, we will uphold the ALJ's findings of fact if supported by "substantial evidence."  See 5 U.S.C. § 706(2)(E).  We review questions of law de novo, but give deference to the Board's interpretation of statutes that Congress has charged the Department with administering.  Welch v. Chao, 536 F.3d 269, 275–76 (4th Cir. 2008) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843–44 (1984)).

We begin with an overview of the regulatory scheme governing ERA whistleblower cases.  The ERA forbids employer retaliation against employees who report violations of nuclear safety regulations.  42 U.S.C. § 5851(a)(1)(A).  An employee who believes that he has been subject to unlawful discrimination in violation of the ERA's whistleblower protections may file a complaint with the Secretary of Labor, who has established

---

[4] In a dissenting opinion, Judge Royce concluded that Smith's protected activity impermissibly resulted in his employment being terminated.

12

certain procedures for the adjudication of ERA whistleblower complaints. Id. § 5851(b)(1); 29 C.F.R. §§ 24.100–24.115.

The Department adjudicates ERA whistleblower cases under a "burden-shifting" framework. Tamosaitis v. URS Inc., 781 F.3d 468, 481 (9th Cir. 2014). Under the Department's adjudication procedures, the employee complainant first must establish a prima facie showing that:

> (i) The employee engaged in a protected activity;
>
> (ii) The employer knew . . . that the employee engaged in the protected activity;
>
> (iii) The employee suffered an adverse action; and
>
> (iv) The circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action.[5]

29 C.F.R. § 24.104(f)(2). If the employee establishes such a prima facie case, the burden shifts to the employer respondent to establish by clear and convincing evidence that the employer "would have taken the same unfavorable personnel action in the absence of [the complainant's protected] behavior." 42 U.S.C. § 5851(b)(3)(D); see also 29 C.F.R. § 24.104(f)(4).

---

[5] The parties to this appeal do not dispute the Board's determination that Smith met his burden of establishing a prima facie case. Instead, their dispute involves the next step in the analysis, namely, whether the employers established by clear and convincing evidence that they would have taken the same adverse action in the absence of the protected activity.

The "same action" or "same decision" affirmative defense requires the employer to prove that it "would have," not simply that it "could have," made the same adverse employment decision absent the protected activity. Speegle, 2014 WL 1758321, at *7; see also Bobreski v. J. Givoo Consultants, Inc., ARB No. 13-001, ALJ No. 2008-ERA-003, 2014 WL 4389968, at *10 (ARB Aug. 29, 2014) (describing the affirmative defense as "the same decision defense"). This standard intentionally was designed to be demanding in nature. See Stone & Webster Eng'g Corp. v. Herman, 115 F.3d 1568, 1572 (11th Cir. 1997) ("For employers, this is a tough standard, and not by accident."), superseded in part on other grounds by regulation, 29 C.F.R. § 24.110.

In evaluating a "same action" or "same decision" affirmative defense, an ALJ must consider three non-dispositive factors, which may be applied flexibly in each individual case. Speegle, 2014 WL 1758321, at *7. These factors are: (1) whether the evidence is "clear" and "convincing" regarding the independent significance of the non-protected activity; (2) the extent of the evidence showing whether the employer would have made the same adverse decision; and (3) any facts that would have changed had the protected activity not occurred. Id.

With regard to the third Speegle factor, the ALJ must consider the hypothetical premise that the employee never engaged in the protected activity, and must disregard

"significant facts that would disappear in the absence of protected activity." Id. at *5, *7, *9 (internal quotation marks omitted). The employer at that point must show that factors extrinsic to the protected activity nevertheless would have led the employer to make the same decision. DeFrancesco v. Union R.R. Co., ARB No. 13-057, ALJ No. 2009-FRS-009, 2015 WL 5781070, at *6 (ARB Sept. 30, 2015) (applying the Speegle factors to a "same decision" affirmative defense in a Federal Rail Safety Act case).

In the present case, the parties agree that Speegle provides the framework for analyzing the affirmative defense asserted by the employers. The parties disagree, however, regarding how the Speegle factors should be applied when the whistleblower's protected disclosure reveals the whistleblower's own misconduct. Smith argues that in such cases, the ALJ cannot consider the "forbidden fruits" of the protected activity, such as the facts discovered by the employers as a result of the employee's protected disclosure. Smith contends that such facts are "logically related" and intextricably intertwined with the employee's protected activity, and would disappear in the absence of the protected activity.

In response, the Department and the employers argue that the ALJ should evaluate the hypothetical circumstance that the employers had learned of identical misconduct in the absence of

15

the protected disclosure, and need not consider the probability that the employers would have learned of the misconduct without the protected disclosure. According to this view, the ALJ would need only to disregard the potentially prejudicial nature of the protected disclosure itself, rather than the entirety of the facts learned as a result of the protected disclosure. We agree with the Department and the employers.

When an employee's protected activity triggers an investigation that reveals the employee's own misconduct, the pertinent question is whether the employer is selectively enforcing rules or selectively imposing extraordinarily harsh discipline against whistleblowers as a pretext for unlawful retaliation. See DeFrancesco, 2015 WL 5781070, at *6. The ALJ therefore must examine whether the rule being enforced against the whistleblower also is enforced against non-whistleblowers, the nature and purpose of the rule, and whether any other evidence suggests a retaliatory motive for the adverse employment action. See id. at *7–8. And, notably, there is no basis in statute or regulation for the additional requirement urged by Smith that the ALJ disregard all "fruits" of an investigation ultimately developed as a result of the employee's protected conduct. See id. at *6.

We therefore decline Smith's effective request that we adopt in ERA cases an "inevitable discovery" rule requiring an

16

employer asserting a "same decision" affirmative defense to prove that the employer independently would have discovered the whistleblower's misconduct had the protected activity not occurred. See Watson v. Dep't of Justice, 64 F.3d 1524, 1528 (Fed. Cir. 1995) (declining to require, as part of a "same decision" affirmative defense in a Whistleblower Protection Act case, that a defendant prove that it would have inevitably discovered the whistleblower's misconduct in the absence of the whistleblower's protected conduct). Such a rule would permit wrongdoers to shield their own misconduct by providing negative information about their own activities. See id. at 1527. As the Federal Circuit has observed, that type of rule would increase the evidentiary burden placed on an employer, contrary to the present burden assigned by statute. Id. at 1530.

We thus agree with the Board's decision in this case that "[p]rotected activity will not shield an under-performing worker from discipline." Accordingly, we hold that in ERA whistleblower cases in which the protected disclosures reveal the whistleblower's own misconduct, the employer is not required to prove that it independently would have discovered the whistleblower's misconduct. Instead, the employer must demonstrate by clear and convincing evidence that it would have imposed the same type of discipline for the same infraction by a

17

non-whistleblowing employee, regardless of the manner in which the employer discovered the misconduct.

III.

Because the Board had not issued its decision in Speegle at the time the ALJ decided the present case, the ALJ instead relied on the similar three-factor test of Carr v. Social Security Administration, 185 F.3d 1318 (Fed. Cir. 1999). Under the factors set forth in Carr, the ALJ considered: (1) the strength of the evidence supporting the employer's stated reasons for taking an adverse personnel action; (2) the strength of evidence showing a retaliatory motive of the employer; and (3) the evidence of similar action taken against similarly situated non-whistleblowers. See Carr, 185 F.3d at 1323.

The ALJ held that the record provided "exceptionally strong evidence" to support the determination that Smith was not trustworthy or reliable because he reported Borders' misconduct only when confronted with an allegation of his own misconduct. The ALJ also determined that the credible testimony of O'Brien and Henline provided "very probative evidence" that the employers took the adverse actions against Smith based on his seven-day delay in reporting the false log entries, rather than because of any retaliatory motive or animosity. Additionally, the ALJ found that while Duke had not been confronted with

18

similar integrity issues involving non-whistleblowers, the record was clear that DZ Atlantic had terminated the employment of non-whistleblowers who had manifested integrity issues.

The decision in Speegle did not require the ALJ to disregard any "fruits" of the employers' investigations, or for the employers to prove that they independently would have discovered Smith's misconduct. And, as the Board observed, the ALJ's factual findings under the Carr factors readily support the same conclusions under the Speegle factors.[6]

The first Speegle factor requires considering whether the evidence was "clear" and "convincing" regarding "the independent significance of the non-protected activity." Speegle, 2014 WL 1758321, at *7 (internal quotation marks omitted). The well-developed record on this issue shows that the ALJ focused on evidence showing "the magnitude and seriousness of Mr. Smith's seven day delay in reporting the fire watch log falsification." The ALJ observed from the testimony that fire watchers in the nuclear power industry are required to meet high standards of trustworthiness and reliability. The ALJ emphasized that "falsification of a fire watch log was a serious violation of

---

[6] We therefore disagree with Smith's alternative argument that because the ALJ did not have the benefit of the Speegle decision, we should remand this case for the ALJ to apply the Speegle factors.

Duke Energy's licensing requirements, and Duke Energy clearly had an interest in being promptly informed of that licensing breach." The ALJ also observed from the evidence that the Commission took action against workers, and licensees such as Duke, "who deliberately create an incomplete or inaccurate record."

With regard to Smith's awareness of the seriousness of the issue, the ALJ found that Smith was cognizant at all times that Borders' false log entries presented a significant issue, as evidenced by his "threatening Mr. Pence that [Smith] would report the falsification if left uncorrected." The ALJ also concluded that Smith's conduct fell far short of strict industry standards, by his "deliberate[ly] withholding" information regarding the log falsification.[7] Thus, the ALJ's findings demonstrate that he considered the substance of the first Speegle factor, and identified overwhelming evidence in the record demonstrating the independent significance of Smith's non-protected activity.

The ALJ also made findings relevant to the second Speegle factor by considering "the evidence that proves or disproves

---

[7] We find no merit in Smith's argument that his misconduct was not nearly as serious as the actions of Borders and Pence. The fact that other employees may have engaged in more egregious conduct does not exempt Smith's conduct from being found untrustworthy and dishonest.

20

whether the employer[s] would have taken the same adverse actions" in the absence of the non-protected activity. Speegle, 2014 WL 1758321, at *7 (internal quotation marks omitted). The ALJ compared the employers' treatment of other non-whistleblowing employees for integrity violations and determined that Smith had not been treated any more harshly than similarly situated non-whistleblowers, like Borders, Pence, or other employees previously terminated by DZ Atlantic.

The ALJ's findings also undercut Smith's present contention that he was not similarly situated to Borders or Pence because his conduct only amounted to "unintentional delay" in reporting Borders' misconduct. The ALJ explicitly found that Smith's delay in reporting was "deliberate" based on Smith's signing "just a quarter inch" below Borders' false certifications, and that Smith had decided to report Borders' false certification only after she charged him with engaging in sexual harassment. We will not disrupt these factual findings, and conclude that substantial evidence supports the ALJ's determination that Smith was treated comparably to the "similarly situated" Borders and Pence.[8]

---

[8] Smith also argues that he was subject to a more severe punishment than Pence, because Henline later decided that Pence was eligible for rehire and attempted to help him find other employment. However, the ALJ credited Henline's testimony that he treated Pence differently because Pence had acknowledged his (Continued)

21

Under the third Speegle factor, the ALJ is required to consider "the facts that would change in the absence of the protected activity." Id. at *7 (internal quotation marks omitted). The fully developed record in the present case did not reveal any facts regarding the fire watchers' actions or duties that would have changed in the absence of Smith's disclosure. Also, consistent with this third Speegle factor, as discussed above, the ALJ analyzed whether the employers "would have taken the same adverse personnel actions if they had discovered by other means . . . Mr. Smith's failure to promptly report the falsification of the February 12, 2008 fire watch logs." The ALJ concluded from the testimony that DZ Atlantic discharged non-whistleblowing employees in response to evidence of their integrity failures, and that Duke had not taken similar action only because it had not confronted such a situation in the past. Thus, the record shows that the ALJ considered the substance of the third Speegle factor, and that his findings relevant to that factor are supported by substantial evidence.

Accordingly, upon our consideration of the record within the framework of the Speegle factors, we hold that substantial

wrongdoing, while Smith had not. Substantial evidence supports the ALJ's factual determination, and Smith's argument therefore fails.

22

evidence in the record supports the ALJ's conclusion that there was clear and convincing evidence that the employers "would have taken the same unfavorable personnel actions" against Smith in the absence of the protected behavior. <u>See</u> 42 U.S.C. § 5851(b)(3)(D).

IV.

For these reasons, we deny Smith's petition for review of the Board's decision dismissing his administrative complaint.

<u>PETITION FOR REVIEW DENIED</u>